PREET BHARARA
United States Attorney for the
Southern District of New York
BY: JEFFREY ALBERTS
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1038



10 CV 3743

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                               :

        Plaintiff,                                :

        - v. -                                    :

$35,100,000 IN UNITED STATES CURRENCY
ON DEPOSIT IN ACCOUNT NUMBER 581186 IN :
THE NAME OF EKC GRANTOR TRUSTS 2000
AT AMARILLO NATIONAL BANK; and            :

$3,900,000 IN UNITED STATES CURRENCY ON   :
DEPOSIT IN ACCOUNT NUMBER 581178 IN
THE NAME OF WUG GRANTOR TRUSTS 2000       :
AT AMARILLO NATIONAL BANK;
                                          :
and all property traceable thereto,
                                          :
        Defendants *in Rem*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VERIFIED COMPLAINT

10 Civ.

Plaintiff United States of America, by its attorney, Preet Bharara, United States

Attorney for the Southern District of New York, for its complaint alleges as follows:

## I. NATURE OF THE ACTION

1.    In this action the United States of America seeks forfeiture of $35,100,000 in

United States currency on deposit in account number 581186 in the name of EKC Grantor Trusts

2000 at Amarillo National Bank, and $3,900,000 in United States currency on deposit in account

number 581178 in the name of WUG Grantor Trusts 2000 at Amarillo National Bank (the "Defendant Funds" or the "Defendants *in Rem*").

2.    The Defendant Funds are subject to forfeiture (a) under Title 18, United States Code, Section 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, and as property traceable to such property, and (b) under Title 18, United States Code, Section 981(a)(1)(C) as property which constitutes and is derived from proceeds traceable to fraud in the sale of securities, in violation of 15 U.S.C. §§ 78ff and 78j(b), wire fraud, in violation of 18 U.S.C. § 1343, bank fraud, in violation of 18 U.S.C. § 1344, and conspiracy to commit these offenses.

## II. JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1345 and 1355.

4.    Venue is proper under 28 U.S.C. § 1355(b)(1)(A), because acts and omissions giving rise to the forfeiture occurred in the Southern District of New York.

5.    The Defendant Funds have not been seized but are within the *in rem* jurisdiction of the Court. The United States does not request authority from the Court to seize any of the Defendant Funds at this time.

## III. STATEMENT OF FACTS

### A.    CRIMINAL CHARGES AND CONVICTIONS

6.    On January 16, 2007, as a result of an investigation conducted by the United States Postal Inspection Service, the United States Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission, and the United States Attorney's Office

-2-

for the Southern District of New York, a federal grand jury in the Southern District of New York returned indictment S3 05 Cr. 1192 (NRB) (the "S3 Indictment") charging Phillip R. Bennett, Robert C. Trosten, and Tone N. Grant with conspiracy (a) to commit fraud in connection with the purchase and sale of securities, (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, (c) to make and cause to be made false statements in a registration statement filed under the Securities Act of 1933, (d) to commit wire fraud, (e) to make and cause to be made false statements and omissions to auditors, (f) to commit bank fraud, and (g) to commit money laundering, in violation of 18 U.S.C. § 371 (Count One); securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Counts Two and Three); false filings with the SEC, in violation of 15 U.S.C. §§ 78o(d), 77x, and 78ff, 17 C.F.R. § 240.15d-2, and 18 U.S.C. § 2 (Counts Four through Six); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Seven through Thirteen); material misstatements to auditors, in violation of 15 U.S.C. §§ 78m and 78ff, 17 C.F.R. § 240.13b2-2, and 18 U.S.C. § 2 (Count Fourteen); bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (Count Fifteen); and money laundering, in violation of 18 U.S.C. §§ 1957(a) and 2 (Counts Sixteen through Twenty).  Bennett was charged in Counts One through Twenty.  Trosten was charged in Counts One, Two, Seven, Eight, Fifteen, Seventeen, and Eighteen.  Grant was charged in Counts One, Two, Eleven, and Fifteen.  A copy of the S3 Indictment is attached hereto as Exhibit 1 and is incorporated herein by reference as if set out in full.

7.    On February 15, 2008, Bennett pled guilty to Counts One through Twenty of the S3 Indictment.  On February 20, 2008, Trosten pled guilty to Counts One, Two, Seven, Fifteen, and Seventeen of the S3 Indictment.  On February 26, 2008, a federal grand jury in the Southern District of New York returned indictment S4 05 Cr. 1192 (NRB) (the "S4 Indictment") charging Tone N. Grant with conspiracy to commit securities fraud, wire fraud, bank fraud, and money laundering, in violation of 18 U.S.C. § 371 (Count One); securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Count Two); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Three); bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (Count Four); and money laundering, in violation of 18 U.S.C. §§ 1957(a) and 2 (Count Five).  A copy of the S4 Indictment is attached hereto as Exhibit 2 and is incorporated herein by reference as if set out in full.

8.    On April 17, 2008, a jury found Grant guilty on Counts One through Five of the S4 Indictment.

9.    On December 4, 2008, a federal grand jury in the Southern District of New York returned indictment S1 07 Cr. 1170 (LBB) (the "S1 Collins Indictment") charging Joseph P. Collins with conspiracy to commit securities fraud, wire fraud, bank fraud, money laundering, to make false filings with the SEC, and to make material misstatements to auditors in violation of 18 U.S.C. § 371 (Count One); securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Counts Two and Three); false filings with the SEC, in violation of 15 U.S.C. § 77x and 18 U.S.C. § 2 (Counts Four and Five); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Six through Nine); and bank fraud, in violation of 18 U.S.C.

§§ 1344 and 2 (Counts Ten through Fourteen).  A copy of the S1 Collins Indictment is attached

hereto as Exhibit 3 and is incorporated herein by reference as if set out in full.

10.    On July 10, 2009, a jury found Collins guilty on Counts One, Two, Three,

Six and Nine of the S1 Collins Indictment.

## B.    RELEVANT ENTITIES AND PERSONS

11.    The plaintiff United States of America is a sovereign and body politic.

### Refco Entities

12.    At certain times relevant to the Verified Complaint, Refco, Inc. was a

Delaware corporation with its principal place of business in New York, New York.  From at least

the mid-1990s, the business of Refco, Inc. and its predecessor entities included providing

execution and clearing services for exchange-traded derivatives and providing prime brokerage

services in the fixed income and foreign exchange markets.  Refco, Inc. held its initial public

offering of common stock on or about August 10, 2005.  Prior to on or about August 10, 2005,

Refco, Inc.'s predecessor entities were privately held.  Refco, Inc. and its predecessor entities are

referred to herein collectively as "Refco."

13.    Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware

corporation that held a substantial ownership interest in Refco.  At various times relevant to the

Verified Complaint, RGHI was owned in whole or in part by Phillip R. Bennett, Thomas H.

Dittmer, and Tone Grant.

### Other Relevant Entities

14.    Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse

Aktiengesellschaft, ("BAWAG"), was the fourth largest bank in Austria at certain times relevant

to the Verified Complaint. BAWAG was owned at various times by, among other entities, the

Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund

(ÖGB). At various times relevant to the Verified Complaint, BAWAG indirectly held a

substantial ownership interest in Refco.

**Relevant Persons**

15.    Phillip R. Bennett ("Bennett") was the President and Chief Executive Officer

and Chairman of Refco from September 1998 until he was forced to resign in October 2005. At

certain times relevant to this Indictment, Bennett also owned between 24.5 percent to 100 percent

of RGHI and served as President and Chief Executive Officer of RGHI. As a result of his

ownership interest in RGHI, at all times relevant to this Verified Complaint, Bennett also had a

substantial indirect ownership interest in Refco.

16.    Joseph P. Collins ("Collins") was a partner at the law firm Mayer Brown

LLP at all times relevant to this Verified Complaint.

17.    Edwin Lochridge Cox, Jr. ("Cox") served on Refco's Board of Directors and

Executive Committee from on or about September 28, 1998 through on or about June 1, 1999.

Cox is a beneficiary of EKC Grantor Trusts 2000 ("EKCGT 2000"), a trust with both United

States Virgin Island and United States situs created under a declaration of trust dated November

17, 2000.

18.    Thomas H. Dittmer ("Dittmer") had a substantial ownership interest in Refco

and served on its Board of Directors and Executive Committee at certain times relevant to the

Verified Complaint.

19.    William L. Graham ("Graham") served on Refco's Board of Directors from on or about April 26, 1999, through on or about August 23, 1999. Graham is the grantor of EKCGT 2000 and WUG Grantor Trusts 2000 ("WUGGT 2000"), a trust with both United States Virgin Island and United States situs created under a declaration of trust dated November 17, 2000.

20.    Tone Grant ("Grant") held a senior management position at Refco. From at least in or about 1997 through in or about September 1998, Grant was the President of Refco. At certain times relevant to the Verified Complaint, Grant indirectly held a significant ownership interest in Refco.

21.    Santo C. Maggio ("Maggio") was Executive Vice President of Refco beginning in 1991 and also was President of a subsidiary of Refco beginning in 2001.

22.    Robert Trosten ("Trosten") held senior management positions at Refco. Among other positions, Trosten was Executive Vice President and Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

## C.    THE SCHEME TO DEFRAUD

23.    From at least as early as in or about the late 1990s, Bennett, Trosten, Maggio, Grant, and Collins, together with others, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors. Starting at least as early as the late 1990s, Bennett, Maggio, Grant, and others embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners. To that end, over the ensuing years, Bennett, Trosten, Maggio, Grant, and/or Collins

systematically (1) covered up both Refco's own losses and customer losses for which Refco

became responsible; (2) moved Refco operating expenses off the company's books; (3) padded

Refco's revenues and/or (4) engaged in undisclosed proprietary trading, all in an effort to mislead

Refco's banks, counterparties, auditors and investors.

24.     In furtherance of this scheme, Bennett, Trosten, Grant, Maggio, Collins, and

others made and caused Refco and others acting on its behalf to make false and fraudulent

statements to Refco's banks, counterparties, customers, auditors, investors, and potential

investors to create false audited financial statements and false public filings with the SEC.  The

scheme included obtaining, through fraud, the following:  lines of credit for Refco; the private

sale of notes in 2004; the sale of 57% of Refco to a group headed by Thomas H. Lee Partners in

2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800

million of bank financing obtained in 2004; and the August 2005 initial public offering of stock

("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco

common stock based on a false and fraudulent registration statement.

***Early Origins of Refco's Financial Problems***

25.     In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn

was owned by Bennett, Grant, and Dittmer.  As of early 1997, RGHI owed Refco at least

approximately $106 million.  Starting later in 1997, Refco directly and indirectly incurred a

series of substantial trading losses that threatened the continued viability of Refco's business.  In

response to these losses, at various times between in or about February 1997 and in or about

October 2005, Bennett and his coconspirators, including Grant, Maggio, and Trosten, moved

losses and expenses out of Refco and into RGHI, and artificially padded Refco's revenues at the

expense of RGHI, in an effort to hide Refco's true liabilities, manipulate its reported earnings, and thereby seek to defraud a purchaser into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners. This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion. The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; (c) transactions designed to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI; and (d) interest purportedly accruing on RGHI's debt to Refco.

26.     As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco. In the late 1990s, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco. When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts. Refco sustained large losses of this type, among other times, in 1997, totaling hundreds of millions of dollars.

27.    Beginning at least as early as 1999, Bennett and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco computer expenses off of Refco's books and onto the books of RGHI.

28.    The result of these actions by Bennett and his coconspirators was to create a large and growing debt owed by RGHI to Refco.  By in or about February 1999, Refco reported in its financial statements that RGHI owed Refco at least approximately $252 million. Those financial statements were false, however, as RGHI in fact owed Refco several hundred million dollars more than what was reported in the financial statements.

29.    Starting at least in or about 1997, Bennett and Maggio, with the knowledge of Grant and others, caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett, Grant, Maggio and others caused Refco to systematically fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, $100 million a day.  Bennett, Grant, Maggio and others then caused Refco to repeatedly misrepresent to the financial institutions to which Refco owed money to settle Refco's customers' transactions the reasons for its failure to make settlement and did not inform them that Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

***BAWAG Invests In Refco***

30.    By the end of 1998, Refco was in a precarious financial condition in light of,
among other things, the significant customer and proprietary trading losses that it had absorbed
and the resulting daily failure to make settlement on customer transactions.  In order to address
that problem, in or about late 1998, Bennett and Grant sought a capital contribution from a
long-time Refco customer, BAWAG Bank of Austria.  In a transaction that closed in 1999,
BAWAG through an affiliate purchased a ten percent ownership interest in Refco for
approximately $95 million, and lent Refco approximately $85 million of additional capital in
return for an option to purchase an additional ten percent of Refco.

***Hiding The RGHI Receivable***

31.    Throughout the period covered by this Verified Complaint, Refco's books
were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of
February.  Among the items the auditors examined each year were "related party transactions,"
and, in particular, transactions between and among Refco and members of Refco's management,
including RGHI.  Refco and RGHI were related parties.

32.    Beginning at least as early as February 1997, Bennett, on behalf of RGHI, hid
the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by
carrying out a series of transactions in order temporarily to pay down all or part of the RGHI
receivable over Refco's fiscal year-end and replace it with a receivable from one or more other
entities not related to Bennett or Refco.   At certain times, Bennett also caused customer losses
which were held in an account at Refco Global Finance, a consolidating entity within Refco
Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the

RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal

year-end.  Bennett and, later, Trosten, and Maggio, aided by Collins from 2000 on, caused the

reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at

least the fiscal year-end on February 28, 1997 through the fiscal year-end on February 29, 2004.

They directed these transactions in order to hide the existence of the related party receivable and

the underlying causes of its existence from Refco's auditors, banks, investors, and others.

   33. In addition to the year-end transactions described above, which were

designed to hide from Refco's auditors and investors the losses and other components of the

RGHI receivable, Bennett, Grant, Trosten, and others consistently lied and caused others to lie to

Refco's auditors in an effort to cover up the size of those losses and other expenses contained in

the RGHI receivable.  For example, on or about April 30, 2003 and April 27, 2004, Bennett and

Trosten each signed letters to Refco's auditors in which they represented that "[r]elated party

transactions and related amounts receivable," including "loans" and "transfers" had all "been

properly recorded or disclosed in the consolidated financial statements," when in fact neither

Bennett nor Trosten had disclosed the true amount of the related party transactions or

indebtedness.

*Refco Sells Notes Based On False Financial Information*

   34. At various times prior to August 2004, Bennett, Maggio, Trosten, and others,

in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital

through the private placement of certain notes.  These notes were sold to investors based, in part,

on the audited financial statements prepared by Refco's auditors, which in turn were rendered

false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.

### Refco Obtains Credit Based On False Financial Information

35.    Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the financial health of Refco.

### BAWAG Invests Further In Refco

36.    In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,415,000.  In return, BAWAG received the right to approximately 27.2% of the proceeds of the sale of Refco and, together with its existing interest in 20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

### RGHI's "Exit Strategy" Develops

37.    In or about 2003, Bennett caused Refco to hire the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.

38.    In connection with RGHI's plan to sell Refco, Bennett, Maggio, and Trosten (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported

revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational problems at the company.

### The Fraudulent Leveraged Buyout Transaction

39.     In or about 2003, Bennett, Maggio, Trosten, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout (the "LBO") was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $511 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

40.     As a precursor to this transaction, Bennett purchased Grant's ownership interest in Refco for approximately $4 million, plus a 50% interest in profits made by Bennett in a future sale of Bennett's interest in Refco, not to exceed $275 million.

41.     In connection with the leveraged buyout transactions, Bennett, Maggio, Trosten, Collins, and others made material false and misleading statements to Thomas H. Lee Partners, the note underwriters, the note purchasers, and the bank syndicate that raised $800 million in loans for Refco. These false and misleading statements included presentations to members of the bank syndicate in which the bank syndicate members were falsely told that Refco did not engage in proprietary trading.

42.     The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion ("LBO Proceeds").  Thereafter, Bennett caused the distribution of certain LBO Proceeds, which had been wired into an RGHI bank

account at JP Morgan Chase in New York, New York, directly or indirectly, to the following

persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| Others Former Equity Partners and Refco Officers, Employees, and Affiliated Parties | $229 million |

43.    In connection with the leveraged buyout transaction, Bennett, Maggio,

Trosten, Collins, and others falsely represented to Thomas H. Lee Partners that Refco had

accumulated approximately $500 million cash in excess working capital and that it would be

distributing the excess working capital through a dividend to its shareholders at the time of the

leveraged buyout.  In fact, Refco had not retained $500 million in excess working capital.

Rather, Refco had funded an account at BAWAG with $110 million in customer funds and a

$390 million loan from BAWAG.  At the end of the leveraged buyout transaction, Bennett

distributed the $110 million taken from Refco to BAWAG and then wrote off $390 million of the

RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

**Bennett Plans To Take Refco Public**

44.    Beginning before the leveraged buyout, Bennett, who remained the Chief

Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco

to the public through an IPO of stock in Refco.

45.    Between the August 2004 leveraged buyout and the August 2005 IPO,

Bennett continued his manipulation of Refco's finances.  At each quarter and year-end period,

Bennett and others caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors.

### Refco's August 2005 IPO

46.    On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Refco's public filings and financial statement failed to disclose the full scope of the related party transactions and the related party indebtedness between Refco and RGHI outlined above.

### Public Disclosure Of The Related Party Debt

47.    In or about early October 2005, a new employee of Refco not involved in the fraud discovered an approximately $430 million receivable on Refco's books from RGHI and reported its existence to the board of directors.  Refco's board of directors then demanded repayment of the debt by Bennett, who repaid Refco approximately $430 million on or about October 10, 2005, having received an emergency loan in that approximate amount from BAWAG.

48.    On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

49.    Plaintiff United States did not learn of, or have cause to investigate the possible existence of, the scheme to defraud or, more specifically, the conspiracy, securities fraud, wire fraud, bank fraud, and money laundering offenses listed in paragraphs 1-3 of this Verified Complaint until after October 10, 2005.

50.    Following Refco's announcement of its discovery of this related party receivable, the market price of Refco stock plummeted, resulting in a loss of more than $1 billion in market capitalization.

51.    On or about October 17, 2005, Refco filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York.  Refco's common stock was subsequently delisted by the New York Stock Exchange.

## E.    THE DEFENDANT FUNDS ARE TRACEABLE TO PROCEEDS OF SECURITIES FRAUD, WIRE FRAUD, BANK FRAUD, AND MONEY LAUNDERING.

52.    As discussed above and in the attached indictments, Bennett, Trosten, Grant, Collins and others raised hundreds of millions of dollars through the LBO that closed on or about August 5, 2004.  The LBO was part of the securities fraud, wire fraud, and bank fraud offenses of which Bennett, Grant, Trosten and Collins were convicted.  Thereafter, Bennett used monetary transactions to cause the distribution of LBO proceeds.  Bennett distributed some of these LBO proceeds at the time of the LBO, or shortly thereafter, but some individuals had been informed in or about June 2004 that they would receive payments in installments.  On or about August 5, 2004, Bennett made initial distributions of some of the LBO proceeds, which had been wired into an RGHI bank account at JP Morgan Chase in New York, New York, to himself, Grant, Trosten,

-17-

and other individuals and entities, including a distribution to Dittmer of $64,577,605 of LBO proceeds that were transferred into an account controlled by Dittmer.

53.     On or about August 27, 2004, Dittmer entered into an agreement with Cox and certain entities, including MLC First Cayman Ltd. ("MLC") addressing disputes between Dittmer and both Cox and MLC concerning any interest that Cox and MLC had in the LBO proceeds (the "LBO Settlement Agreement").  Under this agreement, as consideration for any and all interests Cox and MLC had in the LBO proceeds, Dittmer was to pay or cause to be paid to Cox or his appointed agent $25 million within three days and RGHI was to pay Cox or his appointed agent $14 million due upon the earlier of the transfer of certain subsidiaries to RGHI, or August 4, 2006.

54.     On or about September 1, 2004, pursuant to the terms of the LBO Settlement Agreement, $10 million of LBO proceeds were transferred into J.P. Morgan Chase Bank account number ▓▓▓4993.  That same day, another $15 million of LBO proceeds were transferred into this account.  Later that same day, this $25 million of LBO proceeds was transferred into account number ▓▓4222 at Amarillo National Bank, in the name of "MLC First Cayman Limited."

55.     On or about June 14, 2005, pursuant to the terms of the LBO Settlement Agreement, $14 million in LBO proceeds were transferred into account number ▓▓5740 at Amarillo National Bank, in the name of "MLC First Cayman Ltd."

56.     The $39 million in LBO proceeds transferred pursuant to the LBO Settlement Agreement are directly traceable to various properties currently owned or controlled indirectly by

-18-

Cox, Graham, WUGGT 2000, and EKCGT 2000, and/or entities they control or in which they have an ownership or beneficial interest ("Directly Forfeitable Properties").

57.    Cox, Graham, WUGGT 2000, EKCGT 2000, and the Plaintiff United States of America have agreed to treat the Defendant Funds as a substitute *res* for the Directly Forfeitable Properties and Cox and Graham have agreed not to dispute that the Defendant Funds are directly traceable to the previously alleged transfers made pursuant to the LBO Settlement Agreement on September 1, 2004 and June 14, 2005.

## V. COUNT ONE

### Forfeiture Under Title 18, United States Code, § 981(a)(1)(A)

58.    Incorporated herein are the allegations contained in paragraphs 1 through 57 of this Verified Complaint.

59.    Title 18, United States Code, § 981(a)(1)(A) subjects to forfeiture "[a]ny property real or personal involved in a transaction or attempted transaction in violation of section . . . 1957 . . . of this title, or any property traceable to such property."

60.    Title 18, United States Code, § 1957(a) includes criminal penalties for anyone who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

61.    In a prosecution for this offense, "the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. § 1957(c).

62.    A "monetary transaction," as defined by 18 U.S.C. § 1957(f)(1), means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of

funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution.

63.    "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense under 18 U.S.C. § 1961(1). Section 1961(1)(C) lists 18 U.S.C. §§ 1343, 1344, and 1957 as specified unlawful activities. Section 1961(1)(D) lists "fraud in the sale of securities" as a specified unlawful activity.

64.    Because the Defendants *in Rem* were involved in or traceable to transactions or attempted transactions in which Bennett and his co-conspirators engaged and attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from fraud in the sale of securities, in violation of 15 U.S.C.§§ 78ff and 78j(b), wire fraud, in violation of 18 U.S.C. § 1343, bank fraud, in violation of 18 U.S.C. § 1344, and money laundering, in violation of 18 U.S.C. § 1957, the Defendants *in Rem* are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## VI. COUNT TWO

### Forfeiture Under Title 18, United States Code, § 981(a)(1)(C)

65.    Incorporated herein are the allegations contained in paragraphs 1 through 57 of this Verified Complaint.

66.    Under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified

-20-

unlawful activity' (as defined in Section 1956(c)(7) of [title 18]), or a conspiracy to commit such offense," is subject to forfeiture to the United States.

67.     "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense under 18 U.S.C. § 1961(1).  Section 1961(1)(D) lists the following offenses, among others, as specified unlawful activities:

    a.     "fraud in the sale of securities"

    b.     "any act indictable under . . . Title 18, United States Code, . . . section 1343"

    c.     "any act indictable under . . . Title 18, United States Code, . . . section 1344"

    d.     "any act indictable under . . . Title 18, United States Code, . . . section 1957."

68.     The Defendants *in Rem* are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that they constitute or are derived from proceeds traceable to offenses constituting specified unlawful activity, to wit, fraud in the sale of securities, in violation of 15 U.S.C. §§ 78ff and 78j(b), wire fraud, in violation of 18 U.S.C. § 1343, bank fraud, in violation of 18 U.S.C. § 1344, and money laundering, in violation of 18 U.S.C. § 1957.

69.     By reason of the foregoing, the Defendants *in Rem* became and are subject to forfeiture to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, plaintiff United States of America requests that this Court:

A.      Issue process to enforce the forfeiture of the Defendants *in Rem* and that all persons having an interest in the Defendants *in Rem* be cited to appear and show cause why the forfeiture should not be ordered;

B.      Order forfeiture of the Defendants *in Rem* to the United States of America for disposition according to law;

C.      Grant plaintiff such further relief as this Court may deem just and proper.

Dated: New York, New York
       May 6, 2010

                        PREET BHARARA
                        United States Attorney for the
                        Southern District of New York

              By:       _____
                        JEFFREY ALBERTS
                        Assistant United States Attorney
                        One St. Andrew's Plaza
                        New York, New York 10007
                        Telephone: (212) 637-1038

<u>VERIFICATION</u>

STATE OF NEW YORK                              )

COUNTY OF NEW YORK                         :

SOUTHERN DISTRICT OF NEW YORK          )


     SCOTT F. ROMONOWSKI, being duly sworn, deposes and says that he is a Criminal Investigator with the United States Attorney's Office for the Southern District of New York, and as such has responsibility for the within action; that he has read the allegations contained in the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

     The sources of deponent's information and the grounds of his belief are from official records and files of the United States Government, and information obtained by deponent during an investigation of alleged violations of Titles 15 and 18 of the United States Code.


SCOTT F. ROMONOWSKI
Criminal Investigator
United States Attorney's Office
Southern District of New York


Sworn to before me this
6ᵗʰ day of May, 2010

NOTARY PUBLIC

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 04 2010_

-23-

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :    INDICTMENT
        -v-                         :
                                    :    S3 05 Cr. 1192 (NRB)
PHILLIP R. BENNETT,                 :
ROBERT C. TROSTEN and               :
TONE N. GRANT,                      :
                                    :
              Defendants.           :
                                    :
------------------------------------x


                        COUNT ONE

        (Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
        False Filings With The SEC, To Make Material Misstatements To
                Auditors, Bank Fraud and Money Laundering)

        The Grand Jury charges:

                   RELEVANT ENTITIES AND PERSONS

        1.  At certain times relevant to this Indictment,

Refco, Inc. was a Delaware corporation with its principal place

of business in New York, New York.  From at least the mid-1990s,

the business of Refco, Inc. and its predecessor entities included

providing execution and clearing services for exchange-traded

derivatives and providing prime brokerage services in the fixed

income and foreign exchange markets.  Refco, Inc. held its

initial public offering of common stock on or about August 10,

2005.  Prior to on or about August 10, 2005, Refco, Inc.'s

predecessor entities were privately held.  Refco, Inc. and its

predecessor entities are referred to herein collectively as

"Refco."

2.   At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco.   At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, directly and indirectly.

3.   At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco.   Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.   At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at Refco.   From at least in or about 1997 through in or about June 1998, GRANT was the President of Refco.   At certain times relevant to this Indictment, GRANT indirectly, held a significant ownership interest in Refco.

5.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in Austria.   BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).   At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

2

6.   At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Indictment, RGHI was owned in whole or in part by PHILLIP R. BENNETT and TONE N. GRANT.

**THE SCHEME TO DEFRAUD**

7.   From at least as early as in or about the mid 1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors.  Starting at least as early as the mid 1990s, BENNETT and GRANT embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners.  To that end, over the ensuing years, BENNETT, TROSTEN, GRANT and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

8.   In furtherance of this scheme, PHILLIP R. BENNETT,

ROBERT C. TROSTEN, TONE N. GRANT, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC").  The scheme included obtaining, through fraud, the following:  lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57% of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

9.    In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by PHILLIP R. BENNETT, TONE N. GRANT and one other partner.  As of early 1997, RGHI owed Refco at least approximately $106 million.  Starting later in 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business.  In response to these losses, at various times between in or about May 1997 and in or about October 2005, BENNETT and

his coconspirators, including TONE N. GRANT and ROBERT C. TROSTEN, moved losses and expenses out of Refco and into RGHI, and artificially padded Refco's revenues at the expense of RGHI, in an effort to hide Refco's true liabilities, manipulate its reported earnings, and thereby seek to defraud a purchaser into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners.  This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion.  The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

10.  As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco.  In the later 1990s, certain

5

Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million.  These customer losses included the following:

### *Asian Debt Crisis Customers*

11.  In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### *Customer 1*

12.  In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call

from the CME, using the proceeds of an intra day loan from a
financial institution of at least approximately $90 million to
meet its margin requirements, and then using customer funds taken
from the unregulated segments of Refco's business to repay the
intra day loan.

13.   Recognizing that public acknowledgment of a loss
of more than $90 million would threaten Refco's continued
existence, PHILLIP R. BENNETT, TONE N. GRANT and others known and
unknown falsely represented to the public and other customers
that Refco had not sustained a significant loss as a result of
Customer 1's losses.  In addition, BENNETT, GRANT and ROBERT C.
TROSTEN significantly misrepresented the size of the loss to
Refco's auditors.

14.   PHILLIP R. BENNETT and TONE N. GRANT, having
misrepresented to third parties that Refco had not suffered a
significant loss as a result of Customer 1's trading activity,
caused at least $71 million of debt owed by Customer 1 from the
trading losses to be transferred to become a debt from RGHI to
Refco.

### *Proprietary Trading Losses*

15.   In the late 1990s, Refco also incurred substantial
losses from proprietary trades, or trades carried out on its own
behalf.  For example, in or about 1998, Refco suffered a loss of
at least approximately $40 million on its investment in Russian

bonds after the Russian Government defaulted on its obligations. PHILLIP R. BENNETT, so as to avoid having to acknowledge this loss on Refco's books, caused Refco to inflate the value of the bonds in Refco's books and records to hide the full magnitude of the loss.  Eventually, BENNETT caused those losses to be transferred to RGHI, so that they appeared as a debt from RGHI to Refco.

### *Refco Expenses Moved To RGHI*

16.  Beginning at least as early as 1999, PHILLIP R. BENNETT and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI. For example:

a. From at least as early as February 1999, and continuing until at least in or about February 2002, BENNETT and others caused a total of approximately $46.3 million of computer systems expenses incurred by Refco to be transferred to RGHI, in the following years in the following amounts:

| Fiscal Year End | Amount Transferred to RGHI |
|---|---|
| 2000 | $7,378,927.80 |
| 2001 | $8,797,189.98 |
| 2002 | $9,393,846.76 |
| 2003 | $7,002,153.65 |
| 2004 | $4,876,657.60 |
| 2005 | $5,028,053.21 |
| 2006 | $3,895,030.92 |

b. On or about August 9, 1999, BENNETT and others caused a total of approximately $1.5 million of expenses characterized as payroll expenses to be transferred from Refco to RGHI.

17.  The result of these actions by PHILLIP R. BENNETT and his coconspirators was to create a large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.   Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

9

## Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, PHILLIP R. BENNETT and TONE N. GRANT caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, BENNETT, GRANT and others caused Refco to systematically fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, $100 million a day.  BENNETT, GRANT and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

## BAWAG Invests In Refco

19.  By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions.  In order to address that problem, in or about late 1998, PHILLIP R.

10

BENNETT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria.  In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

## Hiding The RGHI Receivable

20.  Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, PHILLIP R. BENNETT directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT or Refco. At certain times, BENNETT also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global

11

Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end. BENNETT and, later, ROBERT C. TROSTEN, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004. BENNETT and TROSTEN directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, PHILLIP R. BENNETT, and with respect to 1999, TONE N. GRANT, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, PHILLIP R. BENNETT's year-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August

12

2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24. These transactions typically followed standard patterns. For example, in or about February 2000, PHILLIP R. BENNETT caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a. Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco. At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million. In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan. To

13

ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

        (i).     On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

        (ii).    On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by BENNETT on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

        (iii).   On or about the same date, BENNETT signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

        b.   At or around the same time as the

14

transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document this or any of the subsequent BAWAG transactions.

25.   In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, PHILLIP R. BENNETT, TONE N. GRANT and ROBERT C. TROSTEN, and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.  For example, on or about April 30, 2003 and April 27, 2004, BENNETT and TROSTEN each signed letters to Refco's auditors in which they represented that "[r]elated party transactions and related amounts receivable," including "loans" and "transfers" had all "been properly recorded or disclosed in the consolidated financial statements," when in fact neither BENNETT nor TROSTEN had disclosed the true amount of the related party transactions or indebtedness.

15

## Refco Sells Notes Based On False Financial Information

26.  At various times prior to August 2004, PHILLIP R.
BENNETT and ROBERT C. TROSTEN, in furtherance of the scheme to
defraud Refco's potential investors, caused Refco to raise
capital through the private placement of certain notes.  These
notes were sold to investors based, in part, on the audited
financial statements prepared by Refco's auditors, which in turn
were rendered false and misleading by the year-end cover-up
transactions outlined above and the siphoning of Refco expenses
out of Refco and into RGHI.  In particular, BENNETT and TROSTEN
caused Refco to raise the following capital through the sale of
the following notes to investors, based on false and fraudulent
financial statements:

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

## Refco Obtains Credit Counterparty Relationships
## Based On False Financial Information

27.  Because Refco was constantly in need of cash to
cover its transactions and meet settlement, Refco sought and

16

obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted PHILLIP R. BENNETT in hiding the RGHI receivable in the manner described above, BENNETT caused Refco to assist BAWAG in hiding its own balance sheet problem.  In or about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG arranged through BENNETT to hold in an account at Refco certain worthless bonds and other investments that Refco, at BENNETT's direction, maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

17

## BAWAG Invests Further In Refco

29.   In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2% of the proceeds of the sale of Refco and, together with its existing interest in 20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

## BENNETT's "Exit Strategy" Develops

30.   In or about 2003, PHILLIP R. BENNETT caused Refco to hire the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.  BENNETT asked CSFB to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, BENNETT directed CSFB to look for other purchasers for the company, with the understanding that it would be taken public.

31.   In connection with PHILLIP R. BENNETT's plan to sell Refco, BENNETT and ROBERT C. TROSTEN (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by BENNETT and others to disguise the ongoing operational problems at the company.

32.   For example, in or about March 2004, PHILLIP R.

18

BENNETT and others caused approximately $7.9 million in Refco consulting fee expenses to be transferred to RGHI.  In addition, during the fiscal year that ended in February 2004, BENNETT and ROBERT C. TROSTEN caused approximately $4.8 million in Refco computer expenses to be shifted to RGHI.

33.   In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

## The Fraudulent Leveraged Buyout Transaction

34.   In or about 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

19

35.   As a precursor to this transaction, PHILLIP R. BENNETT purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50% interest in profits made by BENNETT in a future sale of BENNETT's interest in Refco.  As a result of their agreement, GRANT was no longer responsible for RGHI's debt to Refco, which as of February 2004 totaled more than approximately $1 billion, and BENNETT controlled all of RGHI immediately prior to the sale to the Lee entities.

**_Lies To Thomas H. Lee Partners_**

36.   In connection with the leveraged buyout transaction, on or about July 9, 2004, PHILLIP R. BENNETT executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior fiscal year, BENNETT owned a substantial interest in RGHI, which had engaged in transactions worth more than $1.5 billion during the year-end cover-up transactions with Refco, and which owed Refco more than $1 billion as of late February 2004.

37.   In connection with the leveraged buyout transaction, on or about July 2, 2004, ROBERT C. TROSTEN executed an officer's questionnaire in which he falsely certified, among

other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the Offering Circular provided to you or which you believe may be inaccurately stated therein," even though TROSTEN knew that the related party and expense shifting transactions had not been disclosed in the offering documents related to the transaction.

38.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.   The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.   The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

39.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others

falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

***Lies To The Note Purchasers***

40.  In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.  Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.  BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.  BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

***Lies To The Bank Syndicate***

41.  In connection with the leveraged buyout

transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.    BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

42.   The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, PHILLIP R. BENNETT caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

23

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| TROSTEN | $48 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $112 million |

43.    In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN falsely represented to Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout.   In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG.   At the end of the leveraged buyout transaction, BENNETT distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

44.    In or about August 2004, after completion of the leveraged buyout transaction, ROBERT C. TROSTEN left Refco.

24

PHILLIP R. BENNETT caused RGHI to pay TROSTEN approximately $48 million from the proceeds of the TH Lee transaction, in order to keep TROSTEN from revealing the ongoing fraud scheme.

### BENNETT Plans To Take Refco Public

45.   After the leveraged buyout, PHILLIP R. BENNETT, who remained the Chief Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

46.   Between the August 2004 leveraged buyout and the August 2005 IPO, PHILLIP R. BENNETT continued his manipulation of Refco's finances:  At each quarter and year-end period, BENNETT caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and BENNETT continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  BENNETT caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|---|---|---|---|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

47.   Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, BENNETT caused the following transactions, among others, to artificially inflate Refco's revenues:

a.   On or about November 17, 2004, BENNETT caused RGHI, in a total of approximately 50 transactions, to purportedly purchase a total of approximately $1.25 billion in US Treasury notes from Refco, and then reversed the transactions the same day, at a loss to RGHI and a profit to Refco of approximately $7.8 million.

b.   On or about February 11, 2005, BENNETT caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

c.   On or about February 17, 2005, BENNETT caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a

result of the transactions.  The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

48.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

49.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. PHILLIP R. BENNETT signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

50.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for

the year ended February 28, 2005 on Form 10K.  PHILLIP R. BENNETT signed the annual report on or about July 19, 2005 in New York, New York.  BENNETT also signed two certifications regarding the annual report.  In those certifications, BENNETT attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company."  As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

51.  On or about August 8, 2005, Refco filed an S-1 registration statement with the SEC in connection with its initial public offering of common stock.  PHILLIP R. BENNETT signed that registration statement on or about August 8, 2005, in New York, New York.

52.  The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or

28

indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

53.  The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

54.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock. PHILLIP R. BENNETT, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in

29

Refco.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

55.  In or about late August 2005, after the completion of Refco's IPO, PHILLIP R. BENNETT caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were unwound.

### Public Disclosure Of The Related Party Debt

56.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by PHILLIP R. BENNETT, who repaid Refco approximately $430 million on or about October 10, 2005, having received an emergency loan in that approximate amount from BAWAG.

57.  On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

30

believes that the receivable was the result of the
assumption by an entity controlled by Mr. Bennett
of certain historical obligations owed by
unrelated third parties to the Company, which may
have been uncollectible. The Company believes that
all customer funds on deposit are unaffected by
these activities. Independent counsel and forensic
auditors have been retained to assist the Audit
Committee in an investigation of these matters.

58.  Following Refco's announcement of its discovery of
this related party receivable, the market price of Refco stock
plummeted, resulting in a loss of well more than $1 billion in
market capitalization.

59.  On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

60.  From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly did combine, conspire, confederate, and agree
together and with each other to commit offenses against the
United States, namely: (a) to commit fraud in connection with the
purchase and sale of securities issued by Refco, in violation of
Sections 78j(b) and 78ff of Title 15, United States Code, and

31

Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act of 1933, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code, Section 1957.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

61.  It was a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT the defendants, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national

32

securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## False Statements In SEC Filings – Exchange Act

62.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings - Securities Act

63.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

### Wire Fraud

64.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Material Misstatements To Auditors

65.   It was further a part and object of the conspiracy

34

that PHILLIP R. BENNETT, the defendant, being an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Securities and Exchange Act of 1934 and subsequently with a class of securities registered pursuant to section 12 of the Securities Exchange Act of 1934, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Securities and Exchange Act of 1934; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC.

## **Bank Fraud**

66.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial

35

institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

## Money Laundering

67. It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN and TONE N. GRANT, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

68. Among the means and methods by which PHILLIP R. BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.    PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public the size of customer losses for which Refco was responsible.

b.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators

36

transferred losses incurred by Refco to BENNETT's company, RGHI.

c.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

d.    PHILLIP R. BENNETT, the defendant, and his coconspirators caused Refco to file false and fraudulent statements with the SEC.

e.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators, made and caused to be made material false statements and omissions to Refco's auditors.

f.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

37

## Overt Acts

69.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.  On or about May 15, 1998, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.  On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.  On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an

38

approximately $720 million loan from a Refco customer to RGHI.

        e.    On or about April 27, 2004, PHILLIP R.
BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to
Refco's auditors representing, among other things, that all
related party transactions and related party amounts receivable
had been fully disclosed to the auditors.

        f.    On or about May 17, 2004, PHILLIP R. BENNETT
and TONE N. GRANT, the defendants, met at a hotel in lower
Manhattan to discuss the more than $1 billion debt that they, as
the owners of RGHI, owed to Refco.

        g.    On or about August 5, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to ROBERT C.
TROSTEN, the defendant, approximately $48 million.

        h.    On or about August 5, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT,
the defendant, approximately $4 million.

        i.    On or about August 8, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT,
the defendant, approximately $12 million.

        j.    On or about February 23, 2005, in New York,
New York, PHILLIP R. BENNETT, the defendant, signed a guaranty
letter on behalf of Refco Group Ltd., LLC. regarding an
approximately $345 million loan from a Refco customer to RGHI.

        k.    On or about April 6, 2005, in New York, New

York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4 registration statement.

l.   On or about May 25, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $450 million loan from a Refco customer to RGHI.

m.   On or about July 19, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's annual report on Form 10K.

n.   On or about August 8, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1 registration statement.

(Title 18, United States Code, Section 371).

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

70.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

71.   From in or about the mid-1990s up to in or about 2004, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce,

the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

72.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

73.  From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and

41

knowingly, directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in connection with the purchase and sale of the
common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

### COUNT FOUR

(False Filing With The SEC – Exchange Act)

The Grand Jury further charges:

74.  The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

75.  On or about July 19, 2005, in the Southern
District of New York and elsewhere, PHILLIP R. BENNETT, the
defendant, unlawfully, willfully, and knowingly made and caused

42

to be made statements in a report and document required to be
filed with the SEC under the Exchange Act, and the rules and
regulations promulgated thereunder, which statements were false
and misleading with respect to material facts, to wit, BENNETT
and others caused Refco to submit, and aided and abetted the
submission of, in New York, New York, to the SEC in Washington,
D.C., Refco's Form 10-K.

> (Title 15, United States Code, Sections 78o(d) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.15d-2;
>       and Title 18, United States Code, Section 2.)

### COUNTS FIVE AND SIX

(False Filing With The SEC – Securities Act)

The Grand Jury further charges:

76.   The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

77.   On or about the dates specified below, in the
Southern District of New York and elsewhere, PHILLIP R. BENNETT,
the defendant, unlawfully, willfully, and knowingly made and
caused to be made, in a registration statement filed with the SEC
under the Securities Act of 1933, untrue statements of material
facts and omitted to state material facts required to be stated
therein and necessary to make the statements therein not
misleading, to wit, BENNETT and others caused Refco to submit,
and aided and abetted the submission of, in New York, New York,

43

to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|------------------|------|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

### COUNTS SEVEN THROUGH THIRTEEN

(Wire Fraud)

The Grand Jury further charges:

78.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

79.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

| Count | Defendant | Approximate Date | Wire Communication |
|-------|-----------|------------------|--------------------|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago, Illinois |
| TWELVE | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |
| THIRTEEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOURTEEN

(Material Misstatements To Auditors)

The Grand Jury further charges:

80.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

81.   From in or about April 2005 to in or about October

45

2005, in the Southern District of New York, PHILLIP R. BENNETT, the defendant, being an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Securities and Exchange Act of 1934 and subsequently with a class of securities registered pursuant to section 12 of the Securities Exchange Act of 1934, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Securities and Exchange Act of 1934; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC.

(Title 15, United States Code, Sections 78m and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2).

## COUNT FIFTEEN

(Bank Fraud)

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if

fully set forth herein.

83.  On or about August 5, 2004, in the Southern
District of New York, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and
TONE N. GRANT, the defendants, unlawfully, willfully and
knowingly, would and did execute, and attempt to execute, a
scheme and artifice to defraud a financial institution, to wit,
HSBC, and to obtain moneys, funds, credits, assets, securities
and other property owned by, and under the custody and control
of, a financial institution, to wit, HSBC, whose deposits were
insured by the Federal Deposit Insurance Corporation, by means of
false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

## COUNTS SIXTEEN THROUGH TWENTY

(Money Laundering)

The Grand Jury further charges:

84.  The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

85.  On or about the dates set forth below, in the
Southern District of New York, the defendants set forth below, in
an offense involving and affecting interstate and foreign
commerce, unlawfully, willfully and knowingly would and did
engage and attempt to engage in monetary transactions in
criminally derived property that was of a value greater than

47

$10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a):

| Count | Defendant | Approximate Date | Transaction |
|-------|-----------|------------------|-------------|
| SIXTEEN | PHILLIP R. BENNETT | August 5, 2004 | $25,322,810 transfer from RGHI's JP Morgan Chase account in New York, NY to BENNETT's JP Morgan Chase account in New York, NY |
| SEVENTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $46,069,300 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| EIGHTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $1,950,000 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| NINETEEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago Illinois |
| TWENTY | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |

(Title 18, United States Code, Sections 1957(a) and 2).

48

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOURTEEN

86.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five, Six and Fourteen; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of this Indictment, PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Two, Seven, and Eight), and TONE GRANT, the defendant (as to acts alleged in Counts One, Two, and Eleven) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following:

a.  At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendants are jointly and severally liable, including but not limited to:

1.  The contents of Account No. ████6752,

49

in the name of Refco Group Holdings, Inc., held at JP Morgan Chase Bank, New York (approximately $63,393.20);

2.    The contents of Account No. ████2791 in the name of Phillip R. Bennett And/or Valerie Bennett, held at JP Morgan Chase Bank, New York (approximately $905,314.91);

3.    The contents of Account No. ████5-00-7, in the name of Phillip Bennett Grantor Retained Annuity Trust ("GRAT"), held at JP Morgan Chase Bank, New York (approximately $13,880,143.28);

4.    All funds from the Liquidation of the Limited Capital Account for Sphinx Managed Futures Index Fund, LP, in the name of Philip Bennett, held at the BISYS Group, Inc. (approximately $974,533.91);

5.    The contents of Account No. ████0832, in the name of Phillip Bennett, held at Citibank, N.A., New York, New York (approximately $13,810,347.00);

6.    The contents of Account No. ████████0258, in the name of Valerie Bennett, held at Wachovia Bank, Charlotte, North Carolina (approximately $440,014.55);

7.    The contents of Account No. ████7710, in the name of Valerie Bennett, held at Merrill Lynch, New York (approximately $1,828,492.00);

8.    The contents of Account. No. ██████████10-19, in the name of Zahava R. Trosten, held at JP Morgan

Chase Bank, New York (approximately $30,024,148.66);

         9.  The contents of Account No. ████████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

         10.  The contents of Account No. ████████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53).

         11. Any and all funds in Account No. ████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

         12. Any and all right, title and interest in the real property and appurtenances known as ████████████, Sarasota, Florida 34236; and

         13.  A sum of at least $1,900,000.00 from Account Nos. ████4805 and ████0709, in the name of Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New Jersey.

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE AND FIFTEEN THROUGH TWENTY

        87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts One and Fifteen of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts Sixteen through Twenty of this Indictment,

PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Fifteen, Seventeen, and Eighteen), and TONE GRANT, the defendant (as to acts alleged in Counts One, Fifteen, and Nineteen) shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.   At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 in the forfeiture allegation above; and

b.   At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 of the forfeiture allegation above.

## SUBSTITUTE ASSETS PROVISION

88.   If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

1.  Any and all right, title and interest in the real property and appurtenances known as ███████████, Gladstone, New Jersey 07934;

2.  Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ████ ███████, New York, New York 10028; and

3.  Any and all right, title and interest in the

53

real property and appurtenances known as 

, Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)

FOREPERSON

MICHAEL J. GARCIA
United States Attorney

54

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### PHILLIP R. BENNETT,
### ROBERT C. TROSTEN,
### TONE N. GRANT

**Defendants.**

### INDICTMENT

S3 05 Cr. 1192 (NRB)

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA

    -v-

TONE N. GRANT,

            Defendant.

------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: FEB 2 6 2008

INDICTMENT

S4 05 Cr. 1192 (NRB)

## COUNT ONE

(Conspiracy To Commit Securities Fraud, Wire Fraud,
Bank Fraud and Money Laundering)

The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

1. At certain times relevant to this Indictment, Refco Inc. was a Delaware corporation with its principal place of business in New York, New York. From at least the mid-1990s, the business of Refco Inc. and its predecessor entities included providing execution and clearing services for exchange-traded derivatives and providing prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. held its initial public offering of common stock on or about August 10, 2005. Prior to on or about August 10, 2005, Refco Inc.'s predecessor entities were privately held. Refco Inc. and its predecessor entities are referred to herein collectively as "Refco."

2. At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at

Refco.  From at least in or about 1997 through in or about 1998, GRANT was the President of Refco.  At certain times relevant to this Indictment, GRANT indirectly held a significant ownership interest in Refco.

3.   At certain times relevant to this Indictment, Phillip R. Bennett, a coconspirator not named herein, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, Bennett had a substantial ownership interest in Refco, directly and indirectly.

4.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in Austria.  BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).  At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

5.   At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Indictment, RGHI was owned in whole or in part by TONE N. GRANT and Phillip R. Bennett.

2

**THE SCHEME TO DEFRAUD**

6.   From at least as early as in or about the mid-
1990s, TONE N. GRANT, the defendant, and Phillip R. Bennett,
together with others known and unknown, schemed to hide the true
financial health of Refco from its banks, counterparties,
auditors, and investors.  Starting at least as early as the mid-
1990s, GRANT, Bennett and others embarked on a strategy to mask
the true performance of Refco's business in order to sell the
company for their own benefit and that of Refco's other owners.
To that end, over the ensuing years, GRANT, Bennett and others
known and unknown systematically (1) covered up both Refco's own
losses and customer losses for which Refco became responsible;
(2) moved Refco operating expenses off the company's books; and
(3) padded Refco's revenues, all in an effort to mislead Refco's
banks, counterparties, auditors and investors, with the goals of
keeping Refco in business and then selling it for the maximum
benefit to its owners and senior management.

7.   In furtherance of this scheme, Phillip R. Bennett,
TONE N. GRANT, and others known and unknown, made and caused
Refco and others on its behalf to make false and fraudulent
statements to Refco's banks, counterparties, customers, auditors,
and investors, and to create false audited financial statements
and false public filings with the United States Securities and
Exchange Commission ("SEC").  The scheme included obtaining,

3

through fraud, the following:  lines of credit for Refco; the
private sale of notes prior to 2004; the sale of 57 percent of
Refco to a group headed by Thomas H. Lee Partners in 2004; the
sale of approximately $600 million of notes to the public in
2004; approximately $800 million of bank financing obtained in
2004; and the August 2005 initial public offering of stock
("IPO") in Refco Inc., in which the public purchased
approximately $583 million of Refco common stock based on a false
and fraudulent registration statement.

**Early Origins Of Refco's Financial Problems**

8.   In or about the mid-1990s, Refco was wholly owned
by RGHI, which in turn was owned by TONE N. GRANT, the defendant,
Phillip R. Bennett, and one other partner.  As of early 1997,
RGHI owed Refco at least approximately $106 million.  Starting
later in 1997, Refco directly and indirectly incurred a series of
substantial trading losses that threatened the continued
viability of Refco's business.  In response to these losses, at
various times between in or about May 1997 and in or about
October 2005, GRANT, Bennett, and their coconspirators, moved
losses and expenses out of Refco and into RGHI, and artificially
padded Refco's revenues at the expense of RGHI, in an effort to
hide Refco's true liabilities, manipulate its reported earnings,
and thereby seek to defraud a purchaser into buying the firm at a
price that would pay off the accumulated debt and ensure a profit

4

to Refco's owners.  This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion.  The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

9.    As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco.  In the later 1990s, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type,

among other times, in 1997, totaling at least approximately $275 million.  These customer losses included the following:

### Asian Debt Crisis Customers

10.   In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### Customer 1

11.   In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call from the CME, using the proceeds of an intra day loan from a financial institution to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the intra day loan.

12.   Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued

6

existence, TONE N. GRANT and others falsely represented to the
public and other customers that Refco had not sustained a
significant loss as a result of Customer 1's losses.  In
addition, GRANT and Bennett significantly misrepresented the size
of the loss to Refco's auditors.

13.  TONE N. GRANT and Phillip R. Bennett, having
misrepresented to third parties that Refco had not suffered a
significant loss as a result of Customer 1's trading activity,
caused at least $71 million of debt owed by Customer 1 from the
trading losses to be transferred to become a debt from RGHI to
Refco.

### Proprietary Trading Losses

14.  In the late 1990s, Refco also incurred substantial
losses from proprietary trades, or trades carried out on its own
behalf.  For example, in or about 1998, Refco lost at least
approximately $40 million in a related party account on an
investment in Russian bonds after the Russian Government
defaulted on its obligations.

### Refco Expenses Moved To RGHI

15.  Beginning at least as early as 1998, Phillip R.
Bennett and others, with the knowledge of TONE N. GRANT, the
defendant, schemed to reduce Refco's expenses (therefore falsely
increasing Refco's apparent profitability) by moving Refco
computer expenses off of Refco's books and onto the books of

RGHI, in the following years in the following amounts:

| Fiscal Year End | Amount Transferred to RGHI |
|-----------------|---------------------------|
| 2000 | $7,378,927.80 |
| 2001 | $8,797,189.98 |
| 2002 | $9,393,846.76 |
| 2003 | $7,002,153.65 |
| 2004 | $4,876,657.60 |
| 2005 | $5,028,053.21 |
| 2006 | $3,595,030.92 |

16.   The result of these actions was to create a large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $170 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.  Thus, a total of at least approximately $422 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

**Refco's Losses Funded By Use Of Customer Funds**

17.   Starting at least in or about 1997, Phillip R. Bennett, with the knowledge of TONE N. GRANT, and others, caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett

and others, with GRANT's knowledge, caused Refco to fail systematically to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, $100 million a day.   Bennett, GRANT and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

## BAWAG Invests In Refco

18.   By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions.   In order to address that problem, in or about late 1998, Phillip R. Bennett and TONE N. GRANT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria.   In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase

9

an additional ten percent of Refco.

## Hiding The RGHI Receivable

19.   Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and RGHI.

20.   Beginning at least as early as February 1998, Phillip R. Bennett, on behalf of RGHI, hid the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.   At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  Bennett and others, with the knowledge of TONE N. GRANT, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28,

10

1998 through the fiscal year-end on February 29, 2004. Bennett and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

21. In 1998 and 1999, Refco and RGHI carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|---|---|
| February 1998 | $175 million |
| February 1999 | $265 million |

22. Beginning in 2000, Refco's year-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|---|---|---|---|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

11

23. These transactions typically followed standard patterns. For example, in or about February 2000, Phillip R. Bennett caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a. Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco. At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million. In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan. To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i). On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by

12

Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

(ii).   On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by Bennett on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii).   On or about the same date, Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b.   At or around the same time as the transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document

13

this or any of the subsequent BAWAG transactions.

24. In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, TONE N. GRANT and others consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

25. At various times prior to August 2004, Phillip R. Bennett, TONE N. GRANT and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on audited financial statements prepared for Refco's auditors that were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

26. Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about

14

1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements that materially misstated the financial health of Refco.

## Refco Helps BAWAG Hide Its Own Balance Sheet Problems

27.  Between 2000 and 2005, while BAWAG assisted Refco in hiding the RGHI receivable in the manner described above, Refco assisted BAWAG in hiding its own balance sheet problem.  In or about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG held in an account at Refco certain worthless bonds and other investments that Refco maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

## BAWAG Invests Further In Refco

28.  In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,415,000.  In return, BAWAG received the right to approximately 27.2 percent of the proceeds of the sale of Refco and, together with its existing interest in

20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

### RGHI's "Exit Strategy" Develops

29.  In or about 2003, Phillip R. Bennett hired the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.

30.  In connection with RGHI's plan to sell Refco, Refco and RGHI management (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational problems at the company.

31.  In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, Refco management shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

### The Fraudulent Leveraged Buyout Transaction

32.  In or about 2003, Phillip R. Bennett and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction. On or

16

about June 8, 2004, TONE N. GRANT and Bennett executed an Equity Purchase and Merger Agreement (the "EPMA") with Thomas H. Lee Partners that set forth the terms of the deal.  At the time that GRANT signed the EPMA, GRANT had full knowledge of the more than $1 billion of debt that RGHI owed to Refco, and knew and expected that as part of the leveraged buyout transaction, misrepresentations regarding Refco would be made to the participants in the leveraged buyout, including Thomas H. Lee Partners, banks and the purchasers of the notes.

33.    As a necessary part of this transaction, and as required by the EPMA, shortly prior to the closing of the leveraged buyout transaction, Phillip R. Bennett purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50 percent interest in profits made by Bennett in a future sale of Bennett's interest in Refco, not to exceed $275 million.  As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $511 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

### Lies To Thomas H. Lee Partners

34. In connection with the leveraged buyout transaction, Phillip R. Bennett and others caused Refco's audited

financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.   The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.   The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

35.   In connection with the leveraged buyout transaction, Phillip R. Bennett and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

**Lies To The Note Purchasers**

36.   In connection with the leveraged buyout transaction, Phillip R. Bennett and others provided to the note underwriters and note purchasers the following false and

18

misleading information:

        a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 34;

        b.   Bennett and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets when, in fact, that collapse caused the Asian Debt Crisis Customer Losses; and

        c.   Bennett and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

    37.  In connection with the leveraged buyout transaction, Phillip R. Bennett and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

        a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 34;

        b.   Bennett and others falsely represented that

Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets when, in fact, that collapse caused the Asian Debt Crisis Customer Losses; and

        c.   Bennett and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

        38.   The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into an RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $160 million |

        39.   In connection with the leveraged buyout transaction, Phillip R. Bennett and others falsely represented to

Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout.  In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG.  At the end of the leveraged buyout transaction, Bennett distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

### Bennett Plans To Take Refco Public

40.  After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, and others planned to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

41.  Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett continued his manipulation of Refco's finances:  At each quarter and year-end period, Bennett caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and Bennett continued to cause Refco expenses to be

assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  Bennett caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|---------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

## Refco's Public Filings And Publicly Traded Securities

42.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

43.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. Phillip R. Bennett signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party

22

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above and falsely claimed that Refco did not engage in proprietary trading.

44.   On or about July 19, 2005, as required by the Securities Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10-K.  Phillip R. Bennett signed the annual report on or about July 19, 2005 in New York, New York.  Bennett also signed two certifications regarding the annual report.  As noted above, the financial statements contained in the annual report were fraudulent in that, among other things, they failed to reflect the related party receivable, the padded revenue, and the shifted expenses.

45.   On or about August 8, 2005, Refco filed an S-1 registration statement with the SEC in connection with its initial public offering of common stock.

46.   The S-4 registration statement, 10-K annual report, and S-1 registration statement required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal

23

years.  These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

47.  The S-4 registration statement, 10-K annual report, and S-1 registration statement each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above.  In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party transaction required to be disclosed in the public filings.

## Refco's August 2005 IPO

48.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under ticker symbol "RFX."

## End Of Quarter Transactions In August 2005

49.  In or about late August 2005, after the completion

24

of Refco's IPO, Phillip R. Bennett caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were unwound.

### Public Disclosure Of The Related Party Debt

50.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10, 2005, having received an emergency loan in that approximate amount from BAWAG.

51.  On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company
> believes that the receivable was the result of the
> assumption by an entity controlled by Mr. Bennett
> of certain historical obligations owed by
> unrelated third parties to the Company, which may
> have been uncollectible. The Company believes that
> all customer funds on deposit are unaffected by
> these activities. Independent counsel and forensic
> auditors have been retained to assist the Audit
> Committee in an investigation of these matters.

25

52.  Following Refco's announcement of its discovery of this related party receivable, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

53.  On or about October 17, 2005, Refco filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York.  Refco's common stock was subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

54.  From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, TONE N. GRANT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely: (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (c) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (d) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

**OBJECTS OF THE CONSPIRACY**

**Securities Fraud**

55.   It was a part and object of the conspiracy that
TONE N. GRANT, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon a person,
in connection with the purchase and sale of notes issued by Refco
and the common stock of Refco Inc., all in violation of Title 15,
United States Code, Sections 78j(b) and 78ff.

**Wire Fraud**

56.   It was further a part and object of the conspiracy
that TONE N. GRANT, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, having devised and

27

intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Bank Fraud

57.   It was further a part and object of the conspiracy that TONE N. GRANT, the defendant, and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

58.   It was further a part and object of the conspiracy that TONE N. GRANT, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign

28

commerce, unlawfully, willfully and knowingly would and did
engage and attempt to engage in monetary transactions in
criminally derived property that was of a value greater than
$10,000 and that was derived from specified unlawful activity, to
wit, securities fraud, bank fraud, and wire fraud, in violation
of Title 18, United States Code, Section 1957(a).

**MEANS AND METHODS OF THE CONSPIRACY**

59.  Among the means and methods by which TONE N.
GRANT, the defendant, Phillip R. Bennett and their co-
conspirators would and did carry out the conspiracy were the
following:

a.  TONE N. GRANT, the defendant, misrepresented
to the public the size of customer losses for which Refco was
responsible.

b.  TONE N. GRANT, the defendant, Phillip R.
Bennett, and their coconspirators transferred losses incurred by
Refco to GRANT and Bennett's company, RGHI.

c.  TONE N. GRANT, the defendant, Phillip R.
Bennett and their coconspirators concealed the size and related
party nature of the debt owed by RGHI to Refco by causing Refco
and others to carry out loan transactions over fiscal year-end
and fiscal quarter-end dates to move the RGHI receivable to one
or more Refco customers.

d.  TONE N. GRANT, the defendant, and his

29

coconspirators used facilities of interstate commerce, including
the use of interstate telephone calls and interstate wire
transfers, in furtherance of the objects of the conspiracy.

e.   TONE N. GRANT, the defendant, and his
coconspirators misrepresented to customers, potential customers,
lenders, investors and others that Refco did not engage in
proprietary trading.

## Overt Acts

60.   In furtherance of the conspiracy and to effect the
illegal objects thereof, the following acts, among others, were
committed in the Southern District of New York and elsewhere:

a.   In or about late 1997, TONE N. GRANT, the
defendant, misrepresented to the public that Refco had not taken
a significant loss in connection with the trading of Customer 1.

b.   On or about May 15, 1998, TONE N. GRANT, the
defendant, and others signed a letter to Refco's auditors
misrepresenting, among other things, that "the accounting records
underlying the financial statements accurately and fairly
reflect, in reasonable detail, the transactions of the company"
and that Refco had properly "recorded or disclosed" all "related
party transactions and related amounts receivable or payable."

c.   On or about February 20, 2004, in New York,
New York, Phillip R. Bennett signed a guaranty letter on behalf
of Refco Group Ltd., LLC regarding an approximately $720 million

30

loan from a Refco customer to RGHI.

d.   On or about April 27, 2004, Phillip R. Bennett signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

e.   On or about May 17, 2004, TONE N. GRANT, the defendant, met with Phillip R. Bennett at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

f.   On or about August 5, 2004, RGHI caused the transfer of approximately $4 million to TONE N. GRANT, the defendant.

g.   On or about August 8, 2004, Phillip R. Bennett caused the transfer of approximately $12 million to TONE N. GRANT, the defendant.

h.   On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

(Title 18, United States Code, Section 371).

**COUNT TWO**

(Securities Fraud)

The Grand Jury further charges:

61.   The allegations contained in paragraphs 1 through

31

53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

62. In or about 2004, in the Southern District of New York and elsewhere, TONE N. GRANT, the defendant, and others, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

## COUNT THREE

(Wire Fraud)

The Grand Jury further charges:

63.   The allegations contained in paragraphs 1 through 53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

64.   On or about August 5, 2004, in the Southern District of New York, TONE N. GRANT, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, in connection with the scheme set forth above, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GRANT caused a $4 million wire transfer to be sent from RGHI's JP Morgan Chase account in New York, New York to GRANT's Harris Trust Account in Chicago, Illinois.

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOUR

(Bank Fraud)

The Grand Jury further charges:

65.   The allegations contained in paragraphs 1 through

53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

      66.  In or about 2004, in the Southern District of New York, TONE N. GRANT, the defendant, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

      (Title 18, United States Code, Sections 1344 and 2).

## COUNT FIVE

(Money Laundering)

The Grand Jury further charges:

      67.  The allegations contained in paragraphs 1 through 53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

      68.  On or about August 5, 2004, in the Southern District of New York, TONE N. GRANT, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000, to wit, a

34

$4 million wire transfer to be sent from RGHI's JP Morgan Chase account in New York, New York, to GRANT's Harris Trust Account in Chicago, Illinois, and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1957(a) and 2).

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE THROUGH THREE

69.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 as alleged in Counts One and Two; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One and Three, TONE GRANT, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including without limitation at least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses.

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE, FOUR AND FIVE

70.   As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18, United States Code, Section 1344, as alleged in Counts One and Four of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts One and Five of this Indictment, TONE N. GRANT, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.   At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses; and

b.   At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property.

## SUBSTITUTE ASSETS PROVISION

71.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

36

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)


_____                    _____
FOREPERSON                                  MICHAEL J. GARCIA
                                            United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

### - v -

### TONE N. GRANT,

### Defendant.

## INDICTMENT

S4 05 Cr. 1192 (NRB)

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 18 USC 1343, 2; 18 USC 1344,2: 18
USC 1957(a).)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

2/26/08   Filed Indictment.

s/ Mag. J. Katz

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :
        -v-                         :        **INDICTMENT**
                                    :
JOSEPH P. COLLINS,                  :        S1 07 Cr. 1170 (LBS)
                                    :
            Defendant.              :
                                    :
------------------------------------x

## COUNT ONE

**(Conspiracy To Commit Securities Fraud, Wire Fraud, Bank Fraud,
And Money Laundering, To Make False Filings With The SEC, And To
Make Material Misstatements To Auditors)**

            The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

            1.   At certain times relevant to this Indictment,

Refco, Inc. was a Delaware corporation with its principal place

of business in New York, New York.  Starting from at least the

mid-1990s, the business of Refco, Inc. and its predecessor

entities included providing execution and clearing services for

exchange-traded derivatives and providing prime brokerage

services in the fixed income and foreign exchange markets.

Refco, Inc. held its initial public offering ("IPO") of common

stock on or about August 10, 2005.  Prior to on or about August

10, 2005, Refco, Inc.'s predecessor entities were privately held.

Refco, Inc. and its predecessor entities are referred to herein

collectively as "Refco."

    2.   At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately held Delaware corporation that held a substantial ownership interest in Refco.

    3.   At all times relevant to this Indictment, Refco was represented by a large, well-known law firm (the "Law Firm").   At all times relevant to this Indictment, the Law Firm maintained offices throughout the United States and the world, including New York, New York.

    4.   At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, was a partner at the Law Firm.   At all times relevant to this Indictment, COLLINS served as the principal outside counsel to Refco and RGHI and, indeed, brought Refco with him as a client when he joined the Law Firm in 1994. As such, COLLINS worked closely with executives and officers of both companies, providing them with legal advice and services with regard to a wide range of matters.   At all times relevant to this Indictment, Refco was the most significant client of JOSEPH P. COLLINS, the defendant, and he billed more time to matters for Refco than he did to matters for any other client and generated more fees for the Law Firm through his work for Refco than he did through any other client.   From in or about 1997 through in or about 2005, COLLINS's relationship with Refco resulted in at least approximately $40 million in fees being invoiced by the Law Firm to Refco.

2

5.   At certain times relevant to this Indictment, Phillip R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco. At certain times relevant to this Indictment, Bennett also owned between 24.5 percent to 100 percent of RGHI and served as President and Chief Executive Officer of RGHI.  As a result of his ownership interest in RGHI, at all times relevant to this Indictment, Bennett also had a substantial indirect ownership interest in Refco.

6.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft was the fourth largest bank in Austria.  At various times relevant to this Indictment, it indirectly held a substantial ownership interest in Refco and made investments in Refco through affiliates it controlled. The bank and its various subsidiaries and affiliates are referred to collectively herein as "BAWAG".

**THE SCHEME TO DEFRAUD**

7.   From at least as early as in or about 1997 through in or about October 2005, JOSEPH P. COLLINS, the defendant, together with Phillip R. Bennett, and others known and unknown, schemed to hide the true financial health and economic structure of Refco, including the existence of a large debt owed to Refco by RGHI and the full extent of BAWAG's economic interest in

3

Refco, from Refco's banks, counterparties, auditors, investors and potential investors. In furtherance of this scheme, COLLINS, Bennett, and others known and unknown, made and caused to be made false and fraudulent statements to Refco's banks, counterparties, auditors, investors, and potential investors, and made and caused to be made false public filings with the United States Securities and Exchange Commission ("SEC").

8. JOSEPH P. COLLINS, the defendant, as Refco's principal outside counsel, actively participated in this scheme to hide the true financial health of Refco and to conceal BAWAG's economic interest in Refco. Acting hand-in-hand with Bennett, COLLINS made affirmative misrepresentations, material omissions, and told deceptive half-truths, all to assist Bennett's scheme to steal more than $2.4 billion from potential investors and lenders. These misrepresentations, omissions, and half-truths -- as well as misrepresentations, omissions, and half-truths told by coconspirators that COLLINS confirmed and furthered -- were believed by Refco's investors and lenders in part because COLLINS's status as a partner with a well-known law firm and as Refco's long-time counsel gave them confidence that such representations were truthful, accurate, and complete. Furthermore, COLLINS documented and caused to be documented transactions that concealed the existence of the large, material debt owed to Refco by RGHI. Furthermore, in meetings, telephone

4

calls, and correspondence, COLLINS lied about this debt and the
existence of these and other transactions -- as well as other
matters relating to Refco's financial health -- to Refco's banks,
investors, potential investors, and their advisers.  COLLINS also
knowingly negotiated and drafted fraudulent agreements and public
filings that resulted in the investment of more than $2.4 billion
in Refco by banks, investors, and the public.  COLLINS also
schemed with Bennett to conceal from potential investors the size
of the investment BAWAG had made in Refco.  As a result of
COLLINS's lies on behalf of Refco, COLLINS and Bennett were able
to achieve the ultimate objective of the scheme, that is,
obtaining, through fraud: a revolving line of credit; the sale of
approximately 57 percent of Refco to a group headed by Thomas H.
Lee Partners in 2004, which was funded by approximately $500
million paid by Thomas H. Lee Partners, the sale of approximately
$600 million of notes to private investors, and approximately
$800 million of bank financing; and the August 2005 IPO of stock
in Refco, in which the public purchased approximately $583
million of Refco common stock.

### Origins Of Refco's Financial Problems

        9.   In or about the mid-1990s, Refco was wholly owned
by RGHI.  As of in or about early 1997, RGHI owed Refco at least
approximately $106 million.  In or about 1997, Refco directly and
indirectly incurred a series of substantial trading losses that

threatened the continued viability of Refco's business.   In response to these losses, at various times between in or about 1997 and in or about October 2005, Refco transferred losses from Refco to RGHI in an effort to hide Refco's true liabilities and thereby seek, among other things, to defraud potential purchasers into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners.   This practice resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion, which was carried on Refco's books as a receivable from RGHI (the "RGHI Receivable").

10.   For example, in or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1") lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").   When Customer 1 could not cover his margin requirements, Refco was ultimately forced to use customer funds taken from the unregulated segments of Refco's business to cover the loss.

11.   Recognizing that public acknowledgment of the actual loss amount would threaten Refco's continued existence, Refco falsely represented to the public that Refco had not sustained significant losses as a result of Customer 1's losses when in fact it had lost in excess of $90 million.

6

12.   At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that Refco had sustained significant losses in connection with the trading activities of its customers and knew that senior Refco management and others known and unknown had lied to the public and others about Refco having sustained such losses.

### BAWAG Invests In Refco

13.   By the end of 1998, significant customer and other losses sustained by Refco placed Refco in a precarious financial condition and caused Refco management to seek an infusion of capital from BAWAG, a long-time Refco customer. In a transaction that closed in or about 1999 and that JOSEPH P. COLLINS, the defendant, and others negotiated and documented, BAWAG purchased a ten percent ownership interest in Refco for approximately $95 million and lent Refco approximately $85 million of additional capital in return for an additional ten percent economic interest in Refco.

14.   At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that, even with the infusion of capital provided by BAWAG in 1999, RGHI continued to owe Refco hundreds of millions of dollars.

### Hiding The RGHI Receivable

15.   Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual

7

basis with a fiscal year-end on the last day of February, as JOSEPH P. COLLINS, the defendant, knew. Among the items the auditors examined each year were "related party transactions" and, in particular, transactions between and among Refco and members of Refco's management and owners. As COLLINS also knew, Refco and RGHI were related parties.

16. In order to hide the size of the large and growing RGHI Receivable from, among others, Refco's auditors, Refco carried out a series of transactions in order temporarily to pay down all or part of the RGHI Receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Refco. The transactions were carried out in order to hide the existence of the related party RGHI Receivable and the underlying causes of its existence from Refco's auditors, banks, investors, potential investors, and others.

17. In or about 1998 and 1999, these transactions were undocumented. However, beginning in or about 2000, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm working at his direction, were responsible for drafting the legal documents that effectuated the transactions that Refco used to pay down, temporarily, all or part of the RGHI Receivable over Refco's fiscal year-ends and replace it with a receivable from one or more other entities not related to Refco (the "Round Trip

8

Loan Transactions"). In summary, these year-end transactions were carried out in the following approximate amounts during the 2000 to 2003 period:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Feb. 2000 | $310 million |
| Feb. 2001 | $450 million |
| Feb. 2002 | $625 million |
| Feb. 2003 | $650 million |

18.  These transactions followed a standard pattern. For example, in or about 2000, JOSEPH P. COLLINS, the defendant, along with senior Refco management and other attorneys at the Law Firm who were working at COLLINS's direction, caused the following transactions to occur with several customers for the purpose of paying down a portion of the RGHI Receivable over the February 2000 year-end. Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which RGHI then used to pay down its obligation to Refco. At the same time, Refco lent to the Three Customers approximately $310 million. As a result, it appeared on Refco's books and records that Refco had approximately $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by approximately $310 million. In or about March 2000, the transactions were reversed, with Refco lending approximately $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI

9

then used to pay back the Three Customers the full amount of the loan.  To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers was memorialized in loan agreements, prepared by the Law Firm's attorneys at COLLINS's direction, between Refco, RGHI and the Three Customers, similar to the agreements that follow:

a.   On or about February 25, 2000, through a loan document prepared at COLLINS's direction, Refco Capital Markets, Ltd., a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

b.   On or about the same day, February 25, 2000, through a loan document prepared by COLLINS and another Law Firm attorney, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by Phillip R. Bennett on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

c.   On or about the same day, Phillip R. Bennett signed a letter of guaranty to Customer 2 on behalf of Refco

10

Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.  The letter of guaranty signed by Bennett was prepared by a Law Firm attorney.

       d.    On or about the same day, Phillip R. Bennett signed a letter of indemnity to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that Refco Group, Ltd. would defend and indemnify Customer 2 against any claims brought against Customer 2, or with respect to any loss suffered by Customer 2, as a result of Customer 2's loan to RGHI.  The letter of indemnity signed by Bennett was prepared by COLLINS and another Law Firm attorney.

       19.    In addition to the customer Round Trip Loan Transactions (the "Customer Round Trip Loan Transactions"), Refco also engaged in undocumented year-end transactions with BAWAG, in which BAWAG lent hundreds of millions of dollars to RGHI, which it then used to pay down its obligation to Refco (the "BAWAG Round Trip Loan Transactions").  At the same time, Refco lent to BAWAG a large amount of money.  As a result, it appeared on Refco's books and records that Refco had hundreds of millions of dollars in receivables from BAWAG, while the RGHI Receivable appeared to be reduced.  After Refco's fiscal year-end, the transactions were reversed.  In summary, these BAWAG Round Trip Loan Transactions were carried out in the following approximate

amounts during the 2000 to 2004 period:

| Date | Approximate BAWAG Round Trip Loans to RGHI |
|------|--------------------------------------------|
| Feb. 2000 | $300 million |
| Feb. 2001 | $300 million |
| Feb. 2002 | $300 million |
| Feb. 2003 | $250 million |
| Feb. 2004 | $250 million |

### Refco Fraudulently Obtains Revolving Lines of Credit

20.   Each year from in or about 1998 through in or about 2003, Refco obtained from a group of banks led by The Chase Manhattan Bank, or its successor JPMorgan Chase Bank (collectively "JPMorgan Chase"), a revolving line of credit. Each revolving line of credit was for a 364-day term.   The total amount of credit available to Refco was in the following approximate amounts in the following years:

| Date | Credit Available |
|------|------------------|
| 1998 | $ 135 million |
| 1999 | $ 130 million |
| 2000 | $ 175 million |
| 2001 | $ 250 million |
| 2002 | $ 302 million |
| 2003 | $ 364 million |

21.   To obtain each such revolving line of credit, Refco submitted to the group of banks led by JPMorgan Chase fraudulent financial statements and made other false statements

12

that materially misstated the financial health of Refco.

22.   JOSEPH P. COLLINS, the defendant, represented Refco in connection with each revolving line of credit described in paragraph 20 above.  From in or about 1998 through in or about 2003, COLLINS, and other attorneys at the Law Firm working at his direction, were responsible for negotiating the legal agreements that set forth the terms of each revolving line of credit.

23.   Each of the legal agreements negotiated by Collins for the revolving lines of credit contained prohibitions against certain conduct by Refco, including explicit prohibitions relating to Refco's ability to provide guarantees to related or third parties.  Additionally, these legal agreements required notice to the banks participating in the lines of credit should violations of such terms occur.  As COLLINS knew, the Customer Round Trip Loan Transactions, including the guarantees associated with each Customer Round Trip Loan Transaction from 2000 onward, violated these terms and no notice to the banks was ever provided.  The concealment of the Customer Round Trip Loan Transactions, including the guarantees associated with the Customer Round Trip Loan Transactions, enabled Refco to obtain, fraudulently, a revolving line of credit from banks led by JPMorgan Chase in each of the years 2000, 2001, 2002, and 2003 and to draw down on those revolving lines of credit.

13

## BAWAG Invests Further in Refco

24.  Because Refco continued to falter financially, Refco management sought additional infusions of capital, turning again to BAWAG for assistance.  To that end, in or about July 2002, Refco, with the assistance of JOSEPH P. COLLINS, the defendant, entered into an agreement with BAWAG whereby BAWAG agreed to provide Refco with the needed capital infusions in exchange for the right to receive proceeds of a future sale of Refco.  Specifically, under the terms of the agreement (called the "Proceeds Participation Agreement" or "PPA"), BAWAG promised to make capital contributions to Refco at or about Refco's fiscal year-ends in 2003, 2004, and 2005 in exchange for a percentage of any proceeds paid in connection with a sale or public offering of Refco (identified in the agreement as the "Participation Right"). The percentage of proceeds BAWAG was entitled to under the terms of the PPA increased with each periodic contribution of capital. Alternatively, the PPA gave BAWAG the right to convert the Participation Right into ownership shares of Refco upon making the payments to Refco as specified in the PPA.  The agreement also contemplated that RGHI would guarantee Refco's performance under the terms of the PPA and otherwise secure the Participation Right.  Under the terms of the PPA and related agreements, as COLLINS well knew, Refco agreed to use $350 million of the purchase price for the Participation Right to pay down a portion

14

of the ballooning debt owed to Refco by RGHI. In accordance with the terms of the PPA, BAWAG made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2 percent of the proceeds of the sale of Refco and, together with BAWAG's existing economic interest in 20 percent of Refco, possessed the economic rights to approximately 47 percent of the proceeds of the sale of Refco.

25.  Having negotiated, drafted, and supervised the drafting of the PPA, JOSEPH P. COLLINS, the defendant, was familiar with all of the terms of the PPA, including the economic interest BAWAG had in Refco through the right conferred upon BAWAG to participate in the proceeds of a sale or public offering of Refco -- or convert its Participation Right into ownership shares of Refco -- as well as RGHI's role guaranteeing Refco's performance and securing BAWAG's Participation Right under the PPA.  COLLINS was also aware that the PPA required Refco to execute amended corporate documentation to reflect the existence of the PPA and that incorporated certain terms of the PPA.

26.  Indeed, as contemplated by the PPA, JOSEPH P. COLLINS, the defendant, drafted and caused to be drafted, simultaneously with the drafting of the PPA, the two agreements through which RGHI, a party related to Refco, agreed to guarantee the performance of Refco under the PPA and to secure BAWAG's Participation Right.  As part of the drafting of the PPA, the Law

15

Firm's attorneys also prepared amended corporate documentation
for Refco that reflected the existence of the PPA and
incorporated into the governance of Refco some of its terms.

27.   As set forth in paragraph 24 above, under the
terms of the PPA, BAWAG made two contributions to Refco totaling
approximately $467,480,000.  At the time of the payments, under
the terms of the PPA, BAWAG had the right to convert this
Participation Right into ownership shares in Refco.  Also as a
result of the payments, Refco executed Refco's amended corporate
documentation that had been prepared as part of the PPA, as
COLLINS advised.  As set forth in paragraph 33 below, COLLINS
helped conceal this amended corporate documentation from
potential investors in Refco, thereby hiding the terms of the PPA
from them.

28.   As further set forth in paragraphs 33-34, 37, 38,
40 and 42 below, JOSEPH P. COLLINS, the defendant, schemed
generally with Phillip R. Bennett to conceal the existence of the
terms of the PPA from potential investors in Refco because
COLLINS and Bennett knew such terms were material to potential
investors.  Through affirmative misrepresentations and omissions,
COLLINS and others concealed from Refco's potential investors:
(1) the terms of the Participation Right conferred upon BAWAG
under the PPA and the resulting obligation Refco would have to
BAWAG upon the sale or public offering of Refco; (2) the role

16

that RGHI, a related party to Refco, played in guaranteeing and
securing BAWAG's Participation Right; (3) BAWAG's ability to
convert its Participation Right into ownership shares in Refco;
(4) the existence of at least $350 million in related party debt
owed from RGHI to Refco in or about 2002, less than half of which
was disclosed in Refco's audited 2002 financial statements; and
(5) that Refco required an infusion of more than $450 million in
cash from BAWAG to conduct its business.

### The Fraudulent Leveraged Buyout Transaction

29.   As contemplated by the PPA, Refco management made
efforts to sell Refco soon after the PPA was executed.

30.   In or about 2003, Refco, assisted by JOSEPH P.
COLLINS, the defendant, began negotiations with Thomas H. Lee
Partners, a private equity fund, regarding that entity's possible
purchase of a controlling stake in Refco as part of a leveraged
buyout transaction.  As ultimately carried out on or about August
5, 2004, the leveraged buyout (the "LBO") was structured as
follows: Thomas H. Lee Partners, through an affiliate, purchased
a 57 percent ownership interest in Refco, in return for
approximately $500 million in cash; simultaneously, Refco sold
approximately $600 million in notes and obtained approximately
$800 million in financing from a syndicate of banks.  When the
transaction was completed, RGHI was left with a 43 percent
ownership interest in Refco.

31.   In connection with the LBO transaction, JOSEPH P.
COLLINS, the defendant, and other attorneys at the Law Firm
represented both Refco and RGHI.  In relation to this
representation, COLLINS drafted and negotiated representations
that appeared in documents and correspondence provided to Thomas
H. Lee Partners and discussed the transaction with persons
representing Thomas H. Lee Partners.  In such documents,
correspondence, and discussions, COLLINS made representations
relating to the financial condition of Refco, among other
matters, that COLLINS knew to be false and misleading and omitted
information necessary to make his statements concerning the same
not misleading.  For example, among other things, COLLINS took
affirmative steps to conceal from Thomas H. Lee Partners the
existence of the terms of the PPA.

32.   At or around the same time as the LBO transaction,
Phillip R. Bennett, through RGHI, purchased from BAWAG the
Participation Right that BAWAG had previously obtained in
connection with the PPA.  Bennett acquired the Participation
Right by purchasing all of the stock of the BAWAG entity that
owned the Participation Right.  According to agreements drafted,
and terms negotiated by, JOSEPH P. COLLINS, the defendant, the
purchase price for this acquisition was approximately $676
million.  Of this amount, approximately $566 million was paid out
of proceeds of the LBO transaction paid to RGHI, as COLLINS knew.

18

### Lies To Thomas H. Lee Partners

#### Lies about the PPA and payments to BAWAG

33.  In connection with the negotiations with Thomas H. Lee Partners, by no later than in or about April 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett agreed (1) to conceal from Thomas H. Lee Partners the terms of the PPA, and (2) to conceal that Bennett, through RGHI, was planning to pay approximately $676 million to purchase the Participation Right from BAWAG, including using approximately $566 million from the proceeds of the LBO transaction.  Accordingly, Bennett and COLLINS both took affirmative steps to conceal the existence of the terms of the PPA and of the agreements relating to RGHI's acquisition of the Participation Right for the stated reason that investors would pay less money for Refco if they were aware of such terms.  Such steps included, but were not limited to, Bennett and COLLINS making false representations directly to Thomas H. Lee Partners, and COLLINS himself specifically directing others not to disclose information relating to RGHI's buyout of the Participation Right from BAWAG.  Furthermore, when asked by Thomas H. Lee Partners to further amend the corporate documentation for Refco, COLLINS prepared new amended corporate documentation that fraudulently concealed the fact that previous corporate documentation (that had been prepared by the Law Firm) had been executed by BAWAG and Refco as part of the PPA, as set

19

forth in paragraph 27 above.

34.    JOSEPH P. COLLINS, the defendant, and Phillip R.
Bennett made similar misrepresentations to Thomas H. Lee Partners
that misled Thomas H. Lee Partners about the amount of money that
BAWAG was to receive at the closing of the LBO transaction.
Specifically, COLLINS and Bennett represented that BAWAG was
receiving many hundreds of millions of dollars less than the
approximately $1.34 billion BAWAG was to receive in the LBO for
its various interests in Refco and in repayment of various loans.

## Lies about related party debt and related party transactions

35.    JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, and others also made affirmative representations and
drafted and negotiated contract terms that misled Thomas H. Lee
Partners and its representatives to believe that RGHI owed Refco
no more than approximately $108 million, all of which amount
COLLINS and Bennett knowingly and falsely represented to Thomas
H. Lee Partners would be repaid by the time the LBO transaction
closed.  In fact, by the time the LBO transaction closed, COLLINS
knew that RGHI actually owed Refco at least $1 billion (which had
been hidden from Refco's auditors through the Round Trip Loan
Transactions), and that even after the LBO, RGHI would continue
to owe Refco hundreds of millions of dollars.  Accordingly,
COLLINS continued to help Bennett conceal the existence of this
related party debt by documenting and causing to be documented

20

year-end and quarter-end Round Trip Loan Transactions similar to those described above in the following approximate amounts at the same time that COLLINS was negotiating the terms of the LBO transaction:

| Date | Approximate Customer Loans |
|------|---------------------------|
| Feb. 2004 | $720 million |
| May 2004 | $700 million |

36.   In connection with the LBO transaction, Refco caused its audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  As JOSEPH P. COLLINS, the defendant, well knew, those audited financial statements were false and misleading in that they, among other things, hid the size of the related party RGHI Receivable, which at the end of January 2004 was, but for the Round Trip Loan Transactions, at least $1 billion, whereas the financial statements falsely and misleadingly reported that there was no related party debt, and that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

37.   As part of the LBO, Thomas H. Lee Partners made numerous inquiries to JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett, about the existence of related party transactions involving Refco.  COLLINS and others made representations and drafted documents (or caused other Law Firm

21

attorneys to draft documents), and negotiated contract terms that concealed from Thomas H. Lee Partners and its representatives the following related party transactions, among others, which were required to be disclosed:

a.   The Round Trip Loan Transactions, which included documented loans made simultaneously by Refco to customers and by the same customers to RGHI at Refco's fiscal year-end and quarter-ends that, taken together, effectuated a related party transaction between Refco and RGHI;

b.   The guarantees from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to guarantee the repayment of hundreds of millions of dollars in loans that customers made to RGHI, a related party, in connection with the Round Trip Loan Transactions;

c.   The indemnification agreements from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to indemnify customers making loans to RGHI, a related party, against claims made against them, or losses suffered by them, in connection with such loans; and

d.   The agreements through which RGHI agreed to guarantee the performance of Refco under the terms of the PPA and to secure BAWAG's right to participate in the proceeds of the future sale of Refco under the same agreement.

### Lies about $500 million in working capital at Refco

38.   JOSEPH P. COLLINS, the defendant, and others also drafted and negotiated contract terms that misled Thomas H. Lee Partners and its representatives into believing that Refco possessed approximately $500 million in excess working capital.

a.   Under contract terms that COLLINS negotiated and drafted, Refco was required to deposit $500 million in working capital it purportedly possessed into a segregated account at BAWAG until the LBO transaction closed, at which time the money was to be distributed to Bennett's company, RGHI.

b.   In reality, as COLLINS well knew, the segregated account established at BAWAG for purposes of holding the $500 million was not working capital, but was funded by, among other sums, an overdraft from BAWAG totaling approximately $390 million.

c.   COLLINS furthered this misrepresentation by approving closing documents that falsely reported that the $500 million in purportedly excess working capital would be transferred to an RGHI account at a bank other than BAWAG, when in fact, as COLLINS well knew, the $500 million was going to remain at BAWAG and be used, in part, to repay the $390 million overdraft.  COLLINS knew that if the true nature of these payments had been disclosed, Thomas H. Lee Partners would have learned of the existence of the terms of the PPA, the large

23

capital infusions Refco received under the terms of the PPA, the large payments being made to BAWAG, and that $390 million of the $500 million that had been represented to Thomas H. Lee Partners as excess working capital and profits of Refco was in fact money borrowed from BAWAG.

### Lies To The Bank Syndicate

39.   At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $800 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco's borrowing from a bank syndicate.

40.   In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, and others known and unknown caused the following false and misleading information to be provided to the bank syndicate, including HSBC Bank USA, N.A., that was raising the approximately $800 million in loans for Refco as part of the LBO transaction and its representatives:

a.   Contract documents relating to the LBO transaction that failed to disclose the guaranty and indemnity agreements that Bennett entered into in connection with the Round Trip Loan Transactions;

b.   Refco's audited financial statements for the fiscal year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 36; and

24

   c. Omissions relating to the terms of the PPA and the planned payment of $952 million to BAWAG in connection with the LBO transaction.

### Lies To The Note Purchasers

   41. At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $600 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco selling 9% Senior Subordinated Notes due 2012 to private investors (the "LBO Notes").

   42. In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, and others known and unknown caused the following false and misleading information to be provided to the underwriters and purchasers of the LBO Notes and their advisers:

   a. Contract documents relating to the LBO transaction that failed to disclose the guaranty and indemnity agreements that Bennett entered into in connection with the Round Trip Loan Transactions;

   b. Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 36; and

   c. Omissions relating to the terms of the PPA and the planned payment of $952 million to BAWAG in connection

25

with the LBO transaction.

### RGHI's Continued Debt To Refco After The LBO

43.   RGHI used the proceeds of the fraudulent LBO transaction in part to pay down a portion of the approximately more than $1 billion RGHI owed to Refco at the time of the transaction.  Even after the proceeds were applied in this manner, however, RGHI continued to owe Refco a substantial sum. Indeed, after the transaction proceeds were applied, RGHI owed Refco hundreds of millions of dollars, as JOSEPH P. COLLINS, the defendant, well knew.

### Securities Fraud in Connection with the Fraudulent Leveraged Buyout Transaction

44.   The LBO transaction included Refco raising approximately $600 million through the sale of the LBO Notes. The LBO Notes were sold privately pursuant to an offering circular, which provided prospective purchasers of the LBO Notes material information about Refco's business and finances.  Refco completed the sale of the LBO Notes in or about August 2004.

45.   JOSEPH P. COLLINS, the defendant, advised both Refco and RGHI in connection with the sale of the LBO Notes.  To that end, COLLINS participated in the drafting of the offering circular that was provided to prospective purchasers of the LBO Notes.

46.   Specifically, JOSEPH P. COLLINS, the defendant, participated in drafting two sections of the offering circular

26

entitled "Risk Factors" and "Certain Relationships and Related Transactions," among other sections.

47. The "Risk Factors" section purported to warn potential investors about myriad risks relating to Refco's business, including, among other things: indebtedness and cash flow needs; credit risks; and conflicts of interest on the part of controlling members of Refco, including Bennett.

48. As JOSEPH P. COLLINS, the defendant, well knew, the "Risk Factors" section of the offering circular contained material misstatements and omissions. COLLINS was aware at the time that he participated in the drafting of the offering circular that, after the LBO transaction occurred, hundreds of millions of dollars would still be owed to Refco by RGHI, which at that time would be solely owned and controlled by Bennett, Refco's Chief Executive Officer. Furthermore, COLLINS knew that Refco, in connection with the quarter-end and year-end Round Trip Loan Transactions, periodically assumed hundreds of millions of dollars in obligations by guaranteeing and indemnifying the performance of RGHI (and ultimately Bennett) with respect to loans extended to RGHI by Refco customers. The offering circular was materially misleading and omissive, as COLLINS knew, because it failed to disclose risks posed to Refco's business by: (1) Refco being owed hundreds of millions of dollars by a related party, RGHI, that was solely owned and operated by Bennett; and

27

(2) Refco periodically incurring hundreds of millions of dollars in obligations guaranteeing and indemnifying the performance of a related party, RGHI, that was solely owned and operated by Bennett.

49.   The "Certain Relationships and Related Transactions" section of the offering circular included a discussion of various agreements and documents relating to the LBO transaction.   Specifically, that section disclosed, among other things: various ownership interests and rights in Refco that would exist after the LBO was completed; the existence of a management agreement between Refco and an affiliate of Thomas H. Lee Partners pursuant to which Refco would pay the affiliate for consulting services and indemnify the same; and an agreement that would entitle management, after the close of the LBO transaction, to receive ownership interests in Refco.

50.   As JOSEPH P. COLLINS, the defendant, well knew, the "Certain Relationships and Related Transactions" section of the offering circular contained material misstatements and omissions.   COLLINS was aware at the time that he participated in the drafting of the offering circular that, after the LBO transaction occurred, hundreds of millions of dollars would still be owed to Refco by RGHI, which at that time would be solely owned and controlled by Phillip R. Bennett, Refco's Chief Executive Officer.   Furthermore, COLLINS knew that Refco, in

28

connection with the quarter-end and year-end Round Trip Loan Transactions, regularly loaned hundreds of millions of dollars to third parties that, in turn, were obligated to loan equal amounts simultaneously to RGHI, an entity controlled by Bennett. Finally, COLLINS knew that Refco, again in connection with the Round Trip Loan Transactions, periodically assumed hundreds of millions of dollars in obligations by guaranteeing and indemnifying the performance of RGHI (and ultimately Bennett) with respect to loans extended to RGHI by Refco customers.  As COLLINS well knew, RGHI's indebtedness to Refco, the loan transactions that involved Refco's loaning hundreds of millions of dollars through third party customers, and the indemnifications and guaranties that Refco extended with regard to RGHI's performance in relation to those loans were all related party transactions.  As COLLINS understood, they were related party transactions both because RGHI and Refco were related parties through RGHI's ownership interest in Refco and also because Bennett was simultaneously an officer of Refco and an owner-officer of RGHI.  COLLINS knew that these related party transactions ought to have been disclosed in the "Certain Relationships and Related Transactions" section and yet omitted them from that section when participating in its drafting.

29

**Refco Plans to Offer Notes Publicly and Take Refco Public**

51.   At all times during the negotiations relating to
the LBO transaction, JOSEPH P. COLLINS, the defendant, understood
that Refco planned to register approximately $600 million of
senior subordinated notes under the Securities Act of 1933
("Securities Act") and to offer to exchange them for the LBO
Notes issued at the time of the LBO transaction.   The
registration of notes permitted them to be traded publicly.
Refco registered the notes under the Securities Act (the
"Registered Notes") on or about April 6, 2005, pursuant to a Form
S-4 registration statement filed with the SEC.

52.   At all times during negotiations of the LBO
transactions, JOSEPH P. COLLINS, the defendant, also understood
that Phillip R. Bennett and others intended to sell a portion of
Refco to the public through an IPO of stock sometime after the
LBO transaction closed.   The IPO occurred on or about August 10,
2005.

53.   During the entire period after the close of the
LBO transaction and while efforts were being made to register the
Registered Notes and to accomplish Refco's IPO, Refco's finances
continued to be manipulated through quarter-end and year-end
Round Trip Loan Transactions designed to hide the existence and
size of the RGHI Receivable from Refco's auditors and investors.
JOSEPH P. COLLINS, the defendant, continued to be responsible for

30

drafting, or causing to be drafted, the documents that effectuated the transactions. COLLINS, along with other Law Firm attorneys acting at COLLINS's direction, drafted documents for the quarter- and year-end Round Trip Loan Transactions, similar to those described above, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|---------------------------|
| Aug. 2004 | $485 million |
| Nov. 2004 | $545 million |
| Feb. 2005 | $345 million |
| May 2005 | $450 million |

54. In addition, in February 2005, Refco engaged in an additional BAWAG Round Trip Loan Transaction in the amount of approximately $250 million.

55. From in or about 2000 until in or about October 2005, JOSEPH P. COLLINS, the defendant, drafted and caused to be drafted documents for at least 17 separate Round Trip Loan Transactions -- effecting loans from Refco to RGHI, through third party customers, of more than approximately $5.5 billion -- each of which concealed the existence of the large related party debt owed from RGHI to Refco from Refco's investors, potential investors, banks, and auditors.

### Refco's Public Filings And Publicly Traded Securities

56. In connection with its offer to exchange registered notes for the LBO notes and its IPO, Refco filed

31

registration statements on Forms S-4 and S-1 with the SEC on or about April 6, 2005, and August 8, 2005, respectively.  Each form required the disclosure of, among other things: (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco.  These disclosures were required in order to apprise investors of, among other things, potential conflicts of interest by management.

57.  The Form S-4 registration statement was based on the offering circular that JOSEPH P. COLLINS, the defendant, helped draft in connection with Refco's sale of the LBO Notes in or about August 2004.  The Form S-4 registration statement, like the offering circular, contained sections entitled "Risk Factors" and "Certain Relationships and Related Transactions."  The Form S-4 registration statement likewise contained the material misstatements and omissions included in the offering circular, as described in paragraphs 48 and 50 above.  In addition to those material misstatements and omissions, the Form S-4 registration statement also contained Refco's audited financial statements, which likewise failed to reflect any of the related party transactions described above, including the debt owed to Refco from RGHI.

58.  JOSEPH P. COLLINS, the defendant, also participated in the drafting of the Form S-1 registration

32

statement.   Among other sections, COLLINS helped draft the
section entitled "Risk Factors."   Refco was required in this
section to discuss the most significant factors that might make
an investment in Refco common stock speculative or risky.   As
COLLINS well knew, this section of the Form S-1 registration
statement contained material misstatements and omissions because
it failed to disclose that: (1) Refco was owed hundreds of
millions of dollars by a related party, RGHI, that was solely
owned and operated by Bennett; and (2) as part of the Round Trip
Loan Transactions, Refco periodically incurred hundreds of
millions of dollars in obligations guaranteeing and indemnifying
the performance of a related party, RGHI, that was solely owned
and operated by Bennett.   Despite his participation in the
drafting of the "Risk Factors" section, COLLINS did not include
these significant undisclosed additional risk factors.   In
addition to those material misstatements and omissions, the Form
S-1 registration statement also contained Refco's audited
financial statements, which likewise failed to reflect any of the
related party transactions, including the debt owed to Refco from
RGHI.

### Refco's August 2005 IPO

59.   On or about August 10, 2005, the public bought
approximately $583 million of Refco's common stock.   Following
the IPO, Refco's common stock was listed on the New York Stock

33

Exchange under the ticker symbol "RFX."

### End Of Quarter Round Trip Loan Transaction In August 2005

60.   In or about late August 2005, after the completion of its IPO, Refco engaged in a final Round Trip Loan Transaction in the amount of approximately $420 million with a Refco customer that temporarily transformed all or part of the RGHI Receivable into a receivable from that customer.   On or about August 31, 2005, after the end of Refco's second quarter, the approximately $420 million Round Trip Loan Transaction was reversed.

### Refco's Public Disclosure Of Related Party Debt

61.   In or about early October 2005, an employee of Refco who was not a coconspirator discovered that a receivable from RGHI of approximately $430 million existed on Refco's books. This discovery was brought to the attention of the audit committee of Refco's board of directors, which demanded repayment of the debt by Phillip R. Bennett.   Bennett repaid Refco approximately $430 million on or about October 10, 2005, having received an emergency loan in that approximate amount from BAWAG.

62.   On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

34

believes that the receivable was the result of the
assumption by an entity controlled by Mr. Bennett
of certain historical obligations owed by
unrelated third parties to the Company, which may
have been uncollectible. The Company believes that
all customer funds on deposit are unaffected by
these activities. Independent counsel and forensic
auditors have been retained to assist the Audit
Committee in an investigation of these matters.

63.  Following Refco's announcement, the market price
of Refco stock plummeted, resulting in an aggregate decline in
shareholder value and market capitalization of more than
approximately $1 billion.

64.  On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

65.  From at least as early as in or about 1997 up to
in or about October 2005, in the Southern District of New York
and elsewhere, JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, and others known and unknown unlawfully, willfully, and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit offenses against the United States,
namely: (a) to commit fraud in connection with the purchase and
sale of securities issued by Refco, in violation of Sections
78j(b) and 78ff of Title 15, United States Code, and Section

35

240.10b-5 of Title 17, Code of Federal Regulations; (b) to make
and cause to be made false and misleading statements of material
fact in reports and documents required to be filed with the SEC
under the Securities Exchange Act of 1934 (the "Exchange Act"),
and the rules and regulations promulgated thereunder, in
violation of Title 15, United States Code, Sections 78o(d) and
78ff; (c) to make and cause to be made false statements in a
registration statement filed under the Securities Act, in
violation of Title 15, United States Code, Section 77x; (d) to
commit wire fraud, in violation of Section 1343 of Title 18,
United States Code; (e) to make and cause to be made false
statements and omissions to Refco's auditors, in violation of
Title 15, United States Code, Sections 78m and 78ff, and Title
17, Code of Federal Regulations, Section 240.13b2-2; (f) to
commit bank fraud, in violation of Section 1344 of Title 18,
United States Code; and (g) to commit money laundering, in
violation of Section 1957(a) of Title 18, United States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

66.  It was a part and object of the conspiracy that
JOSEPH P. COLLINS, the defendant, and others known and unknown
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and

indirectly, would and did use and employ, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

67.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

**False Statements In SEC Filings - Securities Act**

68.    It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

**Wire Fraud**

69.    It was further a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

70.   It was further a part and object of the conspiracy that Phillip R. Bennett, being an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, and with the assistance of JOSEPH P. COLLINS, the defendant, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required be made under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

## Bank Fraud

71.   It was further a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud

39

a financial institution and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

72.   It was further a part and object of the conspiracy that certain members of Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

73.   Among the means and methods by which JOSEPH P. COLLINS, the defendant, and his coconspirators would and did carry out the conspiracy were the following:

a.   Refco management misrepresented to the public the size of customer losses for which Refco was responsible.

40

b.    Refco management transferred losses incurred by Refco to Bennett's company, RGHI.

c.    JOSEPH P. COLLINS, the defendant, helped Refco management conceal the size and related party nature of debt owed by RGHI to Refco by effectuating Round Trip Loan Transactions on behalf of Refco over fiscal year-end and fiscal quarter-end periods to move the RGHI Receivable to one or more Refco customers.

d.    Refco management, with the knowledge and assistance of JOSEPH P. COLLINS, the defendant, concealed from JPMorgan Chase and a group of banks the existence of the Customer Round Trip Loan Transactions, including the guarantees that Refco provided to participating customers, so that Refco could fraudulently obtain revolving lines of credit and draw down on those revolving lines of credit.

e.    Phillip R. Bennett, with the assistance of JOSEPH P. COLLINS, the defendant, caused Refco to file materially false and misleading filings with the SEC.

f.    Phillip R. Bennett, with the assistance of JOSEPH P. COLLINS, the defendant, helped Refco management make and cause to be made material false statements and omissions to Refco's auditors.

g.    JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, and their coconspirators concealed from Thomas H. Lee

41

Partners and its representatives the size of the related party
debt owed to Refco by RGHI, associated related party
transactions, and the terms of Refco's relationship with, and
obligations to, BAWAG;

h.    JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, and their coconspirators, used facilities of interstate
commerce, including the use of interstate telephone calls, email,
and interstate wire transfers, in furtherance of the objects of
the conspiracy.

<u>Overt Acts</u>

74.    In furtherance of the conspiracy and to effect the
illegal objects thereof, the following acts, among others, were
committed in the Southern District of New York and elsewhere:

a.    In or about 1997, Refco management
misrepresented to the public the size of customer losses for
which Refco was responsible.

b.    In or about 2000, Refco management, with the
knowledge and assistance of JOSEPH P. COLLINS, the defendant,
concealed from JPMorgan Chase and a group of banks the existence
of the Customer Round Trip Loan Transactions, including the
guarantees Refco provided to its customers in connection with
those transactions.

c.    In or about 2001, Refco management, with the
knowledge and assistance of JOSEPH P. COLLINS, the defendant,

42

concealed from JPMorgan Chase and a group of banks the existence
of the Customer Round Trip Loan Transactions, including the
guarantees Refco provided to its customers in connection with
those transactions.

            d.    In or about 2002, Refco management, with the
knowledge and assistance of JOSEPH P. COLLINS, the defendant,
concealed from JPMorgan Chase and a group of banks the existence
of the Customer Round Trip Loan Transactions, including the
guarantees Refco provided to its customers in connection with
those transactions.

            e.    In or about 2003, Refco management, with the
knowledge and assistance of JOSEPH P. COLLINS, the defendant,
concealed from JPMorgan Chase and a group of banks the existence
of the Customer Round Trip Loan Transactions, including the
guarantees Refco provided to its customers in connection with
those transactions.

            f.    On or about February 26, 2001, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett executed a guaranty letter on behalf of Refco that JOSEPH
P. COLLINS, the defendant, prepared regarding an approximately
$200 million loan from a Refco customer to RGHI.

            g.    On or about February 26, 2001, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett executed an indemnity letter on behalf of Refco that

JOSEPH P. COLLINS, the defendant, prepared regarding an approximately $200 million loan from a Refco customer to RGHI.

       h.   On or about February 20, 2004, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed a guaranty letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $720 million loan from a Refco customer to RGHI.

       i.   On or about February 20, 2004, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $720 million loan from a Refco customer to RGHI.

       j.   By no later than in or about April 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett, agreed to conceal the terms of the PPA from Thomas H. Lee Partners and to conceal RGHI's approximately $676 million buy out of BAWAG's right to participate in a sale of Refco under the terms of that agreement.

       k.   During a telephone conference in or about March 2004, JOSEPH P. COLLINS, the defendant, misled a representative of Thomas H. Lee Partners about the nature and size of the receivables owed to Refco by related parties at the

time the LBO transaction was being negotiated.

l.     During a telephone conference in or about March 2004, JOSEPH P. COLLINS, the defendant, concealed from a representative of Thomas H. Lee Partners the role of Phillip R. Bennett in guaranteeing and indemnifying loans made by third parties to RGHI in connection with period-end and year-end Round Trip Loan Transactions.

m.     In or about April 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett met with representatives of Thomas H. Lee Partners in New York, New York, and made misrepresentations relating to the financial condition of Refco to those representatives.

n.     On or about April 13, 2004, JOSEPH P. COLLINS caused an email to be sent from the Chicago, Illinois, offices of the Law Firm to New York, New York, attaching a document containing misrepresentations relating to the financial condition of Refco.

o.     On or about May 6, 2004, JOSEPH P. COLLINS, the defendant, caused two emails to be sent from the New York, New York offices of the Law Firm to a lawyer representing Thomas H. Lee Partners located in Texas that concealed the existence of the terms of various agreements, including agreements concerning related party transactions, the disclosure of which was requested by Thomas H. Lee Partners.

45

p.    In or about June 2004, JOSEPH P. COLLINS, the defendant, directed others not to disclose RGHI's planned approximately $676 million buyout from BAWAG of its Participation Right under the PPA.

q.    On or about June 7, 2004, JOSEPH P. COLLINS, the defendant, caused an email to be sent from the New York, New York office of the Law Firm to lawyers representing Thomas H. Lee Partners in Texas that concealed the existence of the terms of various agreements, including agreements concerning related party transactions, the disclosure of which was requested by Thomas H. Lee Partners.

r.    On or about February 23, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed a guaranty letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

s.    On or about February 23, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

t.    On or about May 25, 2005, in New York, New

York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett signed a guaranty letter on behalf of Refco that was
drafted or caused to be drafted by JOSEPH P. COLLINS, the
defendant, regarding an approximately $450 million loan from a
Refco customer to RGHI.

        u.   On or about May 25, 2005, in New York, New
York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett signed an indemnity letter on behalf of Refco that was
drafted or caused to be drafted by JOSEPH P. COLLINS, the
defendant, regarding an approximately $450 million loan from a
Refco customer to RGHI.

      (Title 18, United States Code, Section 371.)

**COUNT TWO**

**(Securities Fraud)**

The Grand Jury further charges:

    75.   The allegations contained in paragraphs 1 through
64, 73 and 74 of this Indictment are repeated and realleged as if
fully set forth herein.

    76.   From at least as early as in or about 1997 through
in or about 2004, in the Southern District of New York and
elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully,
willfully, and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, the mails,
and the facilities of national securities exchanges, did use and

47

employ, in connection with the purchase and sale of 9% Senior

Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and

Refco Finance, Inc., manipulative and deceptive devices and

contrivances, in violation of Title 17, Code of Federal

Regulations, Section 240.10b-5, by: (a) employing devices,

schemes, and artifices to defraud; (b) making untrue statements

of material facts and omitting to state material facts necessary

in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (c)

engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon persons and

entities.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The Grand Jury further charges:

77.  The allegations contained in paragraphs 1 through

64, 73 and 74 of this Indictment are repeated and realleged as if

fully set forth herein.

78.  From at least as early as in or about 1997 through

in or about October 2005, in the Southern District of New York

and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully,

willfully, and knowingly, directly and indirectly, by the use of

48

means and instrumentalities of interstate commerce, the mails,
and the facilities of national securities exchanges, did use and
employ, in connection with the purchase and sale of the common
stock of Refco, Inc., manipulative and deceptive devices and
contrivances, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by: (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material facts and omitting to state material facts necessary
in order to make the statements made, in light of the
circumstances under which they were made, not misleading; and (c)
engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons and
entities.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

### COUNTS FOUR AND FIVE

**(False Filing With The SEC - Securities Act)**

The Grand Jury further charges:

79.   The allegations contained in paragraphs 1 through
64, 73 and 74 of this Indictment are repeated and realleged as if
fully set forth herein.

80.   On or about the dates specified below, in the
Southern District of New York and elsewhere, JOSEPH P. COLLINS,
the defendant, unlawfully, willfully, and knowingly made and

49

caused to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, COLLINS and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|------------------|------|
| FOUR | April 6, 2005 | S-4 |
| FIVE | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

### COUNTS SIX THROUGH NINE

#### (Wire Fraud)

The Grand Jury further charges:

81.  The allegations contained in paragraphs 1 through 64, 73 and 74 of this Indictment are repeated and realleged as if fully set forth herein.

82.  On or about the dates set forth below, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate

50

and foreign commerce, the following writings, signs, signals, and
sounds for the purpose of executing such scheme and artifice:

| Count | Approximate Date | Wire Communication |
|---|---|---|
| SIX | April 13, 2004 | Email from Chicago, Illinois office of the Law Firm to New York, New York attaching clean and marked versions of April 13, 2004 letter to Phillip R. Bennett from Thomas H. Lee Partners |
| SEVEN | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning indemnifications |
| EIGHT | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning material contracts |
| NINE | June 7, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas and representatives of the bank syndicate and LBO Note purchasers |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TEN

### (Bank Fraud)

The Grand Jury further charges:

83. The allegations contained in paragraphs 1 through
64, 73 and 74 of this Indictment are repeated and realleged as if
fully set forth herein.

84. In or about 2000, in the Southern District of New
York, JOSEPH P. COLLINS, the defendant, and others known and
unknown unlawfully, willfully and knowingly, did execute, and
attempt to execute, a scheme and artifice to defraud a financial

51

institution, to wit, JPMorgan Chase, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, JPMorgan Chase, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT ELEVEN

### (Bank Fraud)

**The Grand Jury further charges:**

85.   The allegations contained in paragraphs 1 through 64, 73 and 74 of this Indictment are repeated and realleged as if fully set forth herein.

86.   In or about 2001, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, JPMorgan Chase, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, JPMorgan Chase, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

52

### COUNT TWELVE

#### (Bank Fraud)

The Grand Jury further charges:

87.   The allegations contained in paragraphs 1 through 64, 73 and 74 of this Indictment are repeated and realleged as if fully set forth herein.

88.   In or about 2002, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, JPMorgan Chase, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, JPMorgan Chase, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

### COUNT THIRTEEN

#### (Bank Fraud)

The Grand Jury further charges:

89.   The allegations contained in paragraphs 1 through 64, 73 and 74 of this Indictment are repeated and realleged as if fully set forth herein.

90.   In or about 2003, in the Southern District of New

York, JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, JPMorgan Chase, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, JPMorgan Chase, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

### COUNT FOURTEEN

### (Bank Fraud)

The Grand Jury further charges:

91.   The allegations contained in paragraphs 1 through 64, 73 and 74 of this Indictment are repeated and realleged as if fully set forth herein.

92.   On or about August 5, 2004, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC Bank USA, N.A., and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC Bank USA, N.A., whose

54

deposits were insured by the Federal Deposit Insurance
Corporation, by means of false and fraudulent pretenses,
representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH TEN

93.  As a result of committing one or more of the
foregoing securities fraud offenses, in violation of Title 18,
United States Code, Section 371; Title 15, United States Code,
Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of
Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged
in Counts One, Two, Three, Four, and Five of this Indictment;
wire fraud offenses, in violation of Title 18, United States
Code, Sections 371 and 1343, as alleged in Counts One, Six,
Seven, Eight, and Nine of this Indictment, JOSEPH P. COLLINS, the
defendant, shall forfeit to the United States pursuant to Title
18, United States Code, Section 981(a)(1)(C) and Title 28, United
States Code, Section 2461, all property, real and personal, that
constitutes or is derived from proceeds traceable to the
commission of the securities and wire fraud offenses, including
but not limited to at least $2.4 billion in United States
currency, representing the amount of proceeds obtained as a
result of the charged wire and securities fraud offenses.

55

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE AND SIXTEEN

94.    As a result of committing one or more of the

foregoing bank fraud offenses, in violation of Title 18, United

States Code, Sections 371 and 1344, as alleged in Counts One and

Fourteen of this Indictment, JOSEPH P. COLLINS, the defendant

shall forfeit to the United States pursuant to Title 18, United

States Code, Section 982, any property constituting or derived

from the proceeds obtained directly or indirectly as a result of

the bank fraud offenses, including but not limited to at least

$800 million in United States currency, representing the amount

of proceeds obtained as a result of the charged bank fraud

offenses.

### SUBSTITUTE ASSETS PROVISION

95.    If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

(i)    cannot be located upon the exercise of due

diligence;

(ii)   has been transferred or sold to, or

deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of

the court;

(iv)   has been substantially diminished in value;

or

(v)    has been commingled with other property which

56

cannot be divided without difficulty; it is the intent of the

United States, pursuant to Title 18, United States Code, Section

982 and Title 21, United States Code, Section 853(p), to seek

forfeiture of any other property of said defendant up to the

value of the forfeitable property described above.

   (Title 18, United States Code, Sections 371, 981, 982, 1343,
1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d),
78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5,
240.15d-2; Title 21, United States, Section 853(p); and Title 28,
United States Code, Section 2461.)

FOREPERSON

LEV L. DASSIN
Acting United States Attorney

57

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### JOSEPH P. COLLINS,

Defendant.

## INDICTMENT

S1 07 Cr. 1170 (LBS)

(18 USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344, 2; 18 USC 1957(a)).

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

_____
Foreperson